Burton B. Roberts, J.
“ For five and a half hours throughout the city yesterday, desperate civilians and some police *1041 officers sounded alarms when fires broke out in their neighborhoods, then lugged their own hoses, broke windows in smoke-filled buildings and prayed anxiously that the small force of nonstriking firemen could get to the fires in time.” (New York Times, Nov. 7, 1973.)
Defendants are the president and two other members of the executive board of the Uniformed Firefighters Association (UFA). They have been indicted for reckless endangerment in the second degree and related crimes, arising from their role in calling the first strike of firemen in New York City history on November 6, 1973. This motion by defendants to dismiss the indictment raises several important issues which are believed by the court and all concerned to be questions of first impression concerning the imposition of criminal liability in the context of a public employee strike.
It must be stated at the outset that the court has read the Grand Jury minutes and finds all the factual allegations contained in the indictment to be amply supported by the evidence.
The essentials are set forth herein as contained in the narratively pleaded conspiracy allegations of the first count of the indictment. It appears therefrom that the UFA, for a time prior to the strike, had been engaged in negotiations with the city for a new collective bargaining agreement. During the pendency of these negotiations, its rank-and-file membership passed a resolution authorizing the executive board to conduct a mailed secret ballot of the membership to determine whether the board should be enabled to “ call a total strike of the firefighters of the City of New York at a time and date to be determined by the Executive Board.” Such referendum was thereafter conducted by a firm known as the Honest Ballot Association. The result was that New York City’s firefighters voted not to strike. Nevertheless, the defendants conspired to conceal the true outcome of the ballot from both the membership and the public and decided instead to falsely announce that the membership of the UFA had voted overwhelmingly in favor of a total strike. In conjunction with this initial deception, the defendants planned and attempted to coerce the city to accept their contract terms by falsely representing the existence of the strike [1] ‘ mandate ’ ’ to the city’s negotiators. Finally, on November 6, 1973 the defendants did in fact call and caused a virtual total strike of the firefighters of New York City — a strike that the firemen themselves, still ignorant of the true outcome of the ballot, had democratically voted against.
*1042 The indictment contains five counts.[1] The first, outlined above, charges a conspiracy to commit the crime of reckless endangerment in the second degree (Penal Law, § 120.20). The second count alleges the substantive crime in charging that the defendants “ recklessly engaged in conduct which created a substantial risk of serious physical injury to other persons by causing the People of the City of New York to be deprived substantially of the firefighting services of the members of the Fire Department of the City of New York for five and one-half hours notwithstanding the high daily incidence of fires in various structures occupied by persons throughout the City of New York.” The third count is similarly pleaded in charging the defendants with the crime of reckless endangerment of property (Penal Law, § 145.25). The fourth count charges a conspiracy to commit the crime of coercion in the second degree (Penal Law, § 135.60), charging that the defendants planned “ to coerce the City to accept the terms ’ ’ of the UFA 11 by falsely representing to the City that the Executive Board had received a mandate from the membership to call a total strike and in the event the City did not accept their terms the defendants and other members of the Executive Board would call such a strike ”. The fifth count alleges the crime of attempted coercion in the second degree and charges that the defendants attempted to “ compel and induce ” the City’s Chief Negotiator “ to engage in conduct which [he] had a legal right to abstain from engaging in, by means of instilling in him a fear that if the demands of the defendants were not complied with the defendants would engage in conduct constituting the crime of Reckless Endangerment in the Second Degree ”.
The principal contention made by the defendants and the full complement of municipal unions appearing amici curiae herein is that a strike by firemen cannot be the subject of a criminal prosecution because the Legislature intended the Taylor Law (Civil Service Law, §§ 204r-214)[2] to provide the exclusive remedy and sanctions for public employee labor disputes.
*1043 Before reviewing the merits of this contention, however, it must be promptly observed that should the allegations of fraud contained in the indictment be true, the defendants lack any standing to seek refuge behind the existence of the Taylor Law. That is to say, if these union officers defiled the democratic process, betrayed their trust and defrauded their brethren into striking, then their claim that the Taylor Law’s “ comprehensive scheme ”■ for settling public employee labor disputes protects them here is as audacious as someone claiming “ diplomatic immunity ” when -charged with assaulting an ambassador. For the gravamen of the charges against these defendants, then, is not in striking but rather in causing the City of Few York to be deprived of the protection of its firefighters in a way that bears the same relationship to a bona fide labor action as kidnapping does to babysitting.
In any event, it has been held that the Taylor Law does not provide the exclusive remedy for public employee strikes. The contention was unanimously rejected by the Appellate Division in Caso v. District Council 37 Amer. Federation of State, County and Municipal Employees (43 A D 2d 159) a civil case in which the municipal union servicing Few York City’s sewage treatment facilities was sued by the government of Fassau County for the results of a strike which, allegedly, sent a billion gallons of raw sewage oozing its way toward the beaches of Long Island Sound. Said the court, denying defendant’s motion to dismiss the suit (in language which is tailored to the instant case, pp. 161-163):
“ The Taylor Law reflects the Legislature’s attempt to delicately balance the rights of public employees against those of their employers. It was intended to monitor employer-employee relationships and not public employee relations with the public.
*1044 “ Read the way the defendants suggest, the Taylor Law would become an impenetrable shield of immunity for public employees who may illegally cause serious damage to persons or parties other than their employer. There is no support for such protection in the statute itself, in the language of the legislative committee which studied the area and drafted the bill, or in reason. Nor is there any wisdom in a decision which puts the ‘ right ’ of a public union to engage in illegal activities entirely beyond the court’s ability to find suitable redress, particularly in the compelling circumstances of the instant case, where the union activities endangered the lives and health of millions of persons and caused possibly irreparable damage to the environment.”
The reasoning of Caso must be considered highly persuasive, if not dispositive, of the defendants’ claim here. The violation, if any, in this criminal case was committed against ‘ ‘ The People ” and not merely against the City of New York as a public employer. Nevertheless, amici argue that the rule should be different where criminal penalties are concerned. They reason that since the Taylor Law itself did not include penal sanctions and abrogated the termination of employment sanctions of its predecessor, the Condon-Wadlin Act[3] (Civil Service Law, former § 108), it therefore constitutes a legislative determination that criminal penalties are not applicable to public employee strikes.
These equivocal actions, however, hardly constitute sufficient basis upon which to attempt a judicial reading of the Legislature’s mind. The Taylor Law contains no language precluding criminal prosecutions. Limitations on the fundamental power of a State to impose criminal liability for conduct which jeopardizes human lives and safety are usually specifically expressed rather than merely implied. As the Penal Law itself clearly demonstrates by the explicit exemption of certain labor activity from the purview of some of its provisions (§ 135.60, subd. 6, § 155.05, subd. 2, par. [e], cl. [vi], § 215.50), had the Legislature wished to create any immunity for strike activity it probably would have done so specifically. As things now stand, there is no concrete indication in the Taylor Law or anywhere else sufficient to immunize conduct in a labor dispute from the enforcement of any criminal statutes which are otherwise applicable to the acts performed and their results. Put another way, while there is certainly no crime called “ striking ”, when criminal *1045 liability otherwise applies to -conduct, then a crime has been committed whether that conduct is termed a “ strike ” or anything else. To use an appropriate example, it is clear that a nurse assigned to an intensive care unit of a city hospital who abandons a patient being sustained by life-supporting equipment may properly be prosecuted for homicide if the patient expires as a result, and it matters not at all that the patient was left to die in favor of a picket line. (See 40 Am. Jur. 2d, Homicide, § 88 et seq.; Homicide: Failure to provide medical or surgical attention, 100 ALR 2d 483.) It is difficult to believe that the Legislature was espousing a contrary position when it passed the Taylor Law.
Defendants ’ reliance on United States v. De Laurentis (491 F. 2d 208) is clearly misplaced. In Be Laurentis, the court dismissed an indictment of three union officials who had been charged under an unusual application of an 1870 civil rights statute (U. S. Code, tit. 18, § 241) with (p. 209) “ conspiring to * injure, oppress, threaten and intimidate ’ members of the union in the free exercise of their right not to participate in a concerted labor activity.” Defendants here claim support for their position in that court’s refusal to permit criminal prosecution, absent a specific Federal statute, for violations of employee rights which were declared illegal but were not made criminal by the National Labor Delations Act. This decision, however, was based upon two Federal grounds unrelated to the instant case. First, the court declined to apply a provision dating to the reconstruction era as a catch-all to impose criminal penalties for the violation of Federal rights unrelated to traditional civil rights’ concerns. (See United States v. Johnson, 390 U. S. 563.) Second and more importantly, the court refused to extend Federal jurisdiction to invade what it felt was squarely within the criminal jurisdiction of the States. (See United States v. Enmons, 410 U. S. 396.) The following language of the court on this latter point seems to support the basis of the instant State prosecution: “ we certainly do not imply that in this context [a sit-in at a hospital] state law cannot make criminal conduct that is violent or endangers life ”. (United States v. De Laurentis, supra, p. 214.)
The attempt to have this court interpret the Taylor Law as an indication of a legislative objective to preclude criminal liability for public employee strikes fails in one other significant respect. This is evident from the fact that the provisions of the Taylor Law are applicable to strikes affecting a wide spectrum of public services, most of which do not directly involve *1046 public safety. It is possible to conclude therefrom that the Legislature considered the majority of public employee strikes to be at least momentarily tolerable so that civil sanctions and injunctive relief under the Taylor Law would be workable and adequate remedies in those instances, but that the Legislature left strikes with more serious consequences to whatever penalties might otherwise attach. In other words, when human lives are placed in immediate peril by the strike of a vital government service, the stakes are higher and so should be the penalties, particularly when there is no injunctive process swiftly enforceable enough to forestall the possible immediate and irreparable harm to lives and property.[4] Those in a position of power in a democracy must act with responsibility. The greater the power that breaches its trust, the greater the consequences of the breach must be and the less tolerant the court can be of defiance of the law. (See United States v. Mine Workers, 330 U. S. 258, 312 [concurring opinion per Frankfurter, J.].) In the case of the New York City firefighters, the power involved is nothing less than life and death. I must conclude, therefore, that a strike by firemen may, under the present state of the law, be the subject of a criminal prosecution — given, of course, the existence of a statute which can be said to define the crime. It is this latter aspect which must now be examined.
Defendants and the unions argue that a firefighters’ strike does not meet the Penal Law definition of the reckless endangerment crimes charged in the indictment.
Prefatorily, it must be observed that the framing of the question in terms of whether a “ strike ” constitutes the crime raises the separate issue of criminal responsibility. Defendants seek to disavow any such accountability herein by claiming that this *1047 strike was an individual action by each firefighter who refused to report to duty.[5] There can be little doubt however, regardless of whether or not the defendants’ authority was fraudulently obtained, that the defendants “ called ” this strike. It is also reasonable to believe that these union leaders, relying upon past discipline, collective psychology and a century of labor history, fully expected that their call would be followed by a walkout of the membership. The defendants can hardly now be heard to say in their defense that they were “ only giving orders ”. Clearly, a trial jury could properly be convinced beyond a reasonable doubt that the defendants “ solicit [ed], request [ed], command [ed], importun[ed] or intentionally aid[ed] ” in the commission of the crime (see Penal Law, § 20.00). Indeed, a jury in this case could probably find that the power the defendants exercised to cause the abandonment of this city by its firemen, especially in view of the phoney “ mandate ” they allegedly utilised, was as real and immediate as pushing a button. (Cf. People v. De Lury, 23 N Y 2d 175, 187.) Such a conclusion is amply supported by the Brand Jury testimony.
Framed in terms of the allegations and the statutory language, the ultimate question is whether a jury could properly find that depriving the people of this city of their fire protection constitutes “ reckless ” conduct which creates “ a substantial risk of serious physical injury to another person ” (Penal Law, § 120.20) or “ a substantial risk of damage to the property of another person in an amount exceeding two hundred fifty dollars ” (Penal Law, § 145.25). Defendants remain understandably silent in this regard, perhaps realizing that the statutes are a stunning understatement compared to the spectre of neighborhoods destroyed by fire in a matter of hours. Without the necessity of quoting the horrifying conflagration statistics introduced in the Brand Jury and certain to be introduced at the trial, it need only be said that a trial jury could find that the risk inherent in depriving more than eight million people — many of whom live in close quarters in the tinderbox slums of Harlem, Bedford-Stuyvesant and the South Bronx — of the protection of a force of 10,000 firefighters — most of whom are needed to prevent the loss of life and property in such places — was not only “ substantial ” but was tantamount to imminent peril. And the jury might well be convinced beyond a reasonable doubt that the callousness of the conduct which created such *1048 a risk for mere personal or pecuniary gain amounted to “ recklessness ” under the statute.[6]
Defendants and the unions do argue, however, that the reckless endangerment sections were not intended to apply to conduct which does not involve the performance of a physical act. In support of this proposition, they point to the Practice Commentaries to sections 120.20 and 120.25 of the Penal Law (McKinney’s Cons. Laws of N. Y., Book 39, Penal Law, § 120.20, p. 218; § 120.25, p. 219) which use as illustrations the throwing of a rock through a window and the firing of a gun into a crowd. Such mere examples, however, are surely not meant to be exhaustive and cannot be said to limit the otherwise clear import of. the statute itself. Moreover, the Penal Law definitions of “ conduct ” as “ an act or omission ” (§ 15.00, subd. 4) and of an “ omission ” as “a failure to perform an act as to which a duty of performance is imposed by law ” (§ 15.00, subd. 3) directly refute the defendants’ claim. Admittedly, there has never been a prosecution similar to the instant case. But there also has never been such a strike. And while the reckless endangerment statutes are new sections with little in the way of decisional law to interpret them, the concept of imposing criminal liability for harm caused by the willful omission to perform a legal duty to protect another is not without precedent in the case law of this Staté (People v. Smith, 56 Misc. 1) and is even more firmly established in numerous other Federal, State and foreign jurisdictions. (See collected cases and statutes cited in G. Hughes, Criminal Omissions, 67 Yale L.J. 590, 620 et seq.; Criminal Omissions, 55 Harvard L. Rev. 615, 625 et seq.; Failure to Rescue: A Comparative Study, 52 Columbia L. Rev. 631; 40 Am. Jur. 2d Homicide, § 88 et seq.) I must conclude, therefore, that a strike by firemen may properly be the subject of a prosecution for the reckless endangerment crimes.
The only other arguments worthy of mention pertain to the coercion charges. The relevant portions of the statute (Penal Law, § 135.60) are set forth in the margin below.[7] Defendants *1049 claim that a union’s threat to cause a strike to compel acceptance of its demands cannot constitute coercion in view of the exception contained in subdivision 6 for strike threats made in order to obtain union benefits. This contention overlooks two readily observable points. First, subdivision 6 and its exception apply only to a threat to cause a strike injurious to some person’s business. The strike threatened in this case was one that would cause the paralysis of a governmental function and be injurious to lives and property. Second, the defendants are not charged in this case with a violation of subdivision 6 but rather with a violation of subdivision 3, that is, with threatening to engage in conduct constituting a crime (reckless endangerment) in order to compel the city’s negotiator to capitulate to their demands.
Aniici claim that to uphold the coercion counts in this case would be to inhibit the bargaining ability of union negotiators and thereby[1] ‘ destroy the entire collective bargaining process Such overstatement, however, is belied by the rarity and uniqueness of a situation which creates the kind of immediate public danger presented by a strike of New York City firefighters. It is belied as well by the essentially narrow basis for criminal prosecution which emerges from the indictment and decision in the instant case. These defendants, it is charged in substance, represented to negotiators that they had been given the power to permit the imminent destruction of lives and property in this city and threatened to exercise that awesome power if their demands were (not met. Amici do a disservice to their own tradition of responsibility and to the highest traditions of public service exemplified by the firemen themselves, who voted not to strike, by suggesting that that kind of coercion has any validity in good faith bargaining. If any bargaining process is ihhibited or destroyed by this case, it will not be any legitimate or honorable kind, but only the kind in which people’s safety, lives and homes are held for ransom.
The court has considered the other arguments made by defendants and finds them to be without merit.
For the foregoing reasons, the motion to dismiss the indictment is denied and the defendants are held for trial.

. Three additional counts contained in the indictment, which charged the defendants with a conspiracy to obstruct governmental administration and two substantive counts of obstructing governmental administration (Penal Law, § 195.05) have heretofore been dismissed on motion by the People.

. The Taylor Law was enacted in 1967 (L. 1967, ch. 392; Civil Service Law, art. 14, §§ 200-212) to supersede the Condon-Wadlin Act (Civil Service Law, former § 108) and with the stated objective “to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government ” (§ 200). It prohibits strikes by public *1043 employees (.§ 210) and provides for injunctive relief to restrain such strikes as well as punishment for contempt under section 750 of the Judiciary Law for noncompliance with a restraining order (,§ 211). Unlike Condon-Wadlin, however, the Taylor Law does not mandate the dismissal of strikers. It also grants to public employees rights which were not formerly possessed by them, to wit, the right to form and be represented by employee organizations of their own choosing (§§ 202-203) and the right to negotiate collectively with public employers and require public employers to negotiate and enter into collective agreements with" them (§§ 203-204). It sets up a Public Employee Relations Board to resolve representational disputes and to participate in the “voluntary resolution” of disputes between public employee organizations and public employers. It also authorizes local governments to adopt “ provisions and procedures ” which “are substantially equivalent” to those of the Taylor Law (§ 212). The New York City implementation of the Taylor Law is contained in its Collective Bargaining Law (Administrative Code of City of New York, § 1173-1.0 et seq.).

. See note 2, supra.

. It is interesting to note that even commentators in favor of the principle that public employees should be permitted to strike single out strikes affecting public safety (particularly by police and firemen) as unacceptable for even the shortest duration because of the inadequacy of injunctive relief. (E.g., J. F. Burton Jr. and C. Krider, The Role and Consequences of Strikes by Public Employees, 79 Yale L. J. 418 [hereinafter referred to as Burton and Krider]; T. Kheel, Strikes and Public Employment, 67 Michigan L. Rev. 931.) Consider the following: “In the ease of strikes by essential employees, such as policemen, the deterioration of public order occurs almost immediately. During the first few hours of the police walkout in Montreal [1969], robberies occurred at eight banks, one finance company, two groceries, a jewelry store and a private bank [footnote omitted]. In the ease of the Boston police strike in 1919, outbreaks began within four hours after the strike had been commenced. Such consequences require that strikes by police and other essential services be outlawed in advance.” (Burton and Krider, 79 Yale L. J. 43.8, 434.)

. Of course, the question of the liability of individual strikers is not before this court.

. Subdivision 3 of section 15.05 of the Penal Law defines “ recklessly ” as follows: “A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct a reasonable person would observe in the situation.”

. “ § 135.60 Coercion in the second degree.
A person is guilty of coercion in the second degree when he compels or induces a person to engage in conduct which the latter has a legal right to abstain from
*1049 engaging in, or to abstain from engaging in conduct in which he has a legal right to engage, by means of instilling in him a fear that, if the demand is not complied with, the actor or another will: ” ” * 3. Engage in other conduct constituting a crime; or * * * 6. Cause a strike, boycott or other collective labor group action injurious to some person’s business; except that such a threat shall not be deemed coercive when the act or omission compelled is for tie benefit of the group in whose interest tie actor purports to act,”