OPINION OF THE COURT
Edwin Kassoff, J.
In these actions seeking damages resulting from a mass transit strike conducted by the defendant unions in April of 1980 against the New York City Transit Authority (the *459 Transit Authority) and the Manhattan and Bronx Surface Operating Authority (MABSTOA), the defendants move pursuant to CPLR 3211 (subd [a], par 7) to dismiss the complaint for failure to state a cause of action.
Plaintiffs commenced an action in this court as a class action at about the same time they commenced another action in New York County. Subsequently, by an order dated August 6, 1980, the New York County action was removed to this court to be tried jointly with the class action. By stipulation, all outstanding sufficiency motions were held for a single submission, which is now before this court.
This application is a plea in abatement, questioning the legal sufficiency of the cause rather than the veracity of the facts pleaded. For the purposes of this motion, the complaint should “be liberally construed and deemed to allege whatever can be reasonably implied from its statements”. (4 Weinstein-Korn-Miller, NY Civ Prac, par 3211.36, p 32-113.) A party moving to dismiss a complaint on the ground that a cause of action has not been stated concedes for the purposes of such motion every fact pleaded and every inference that may be drawn. (Robins v Finestone, 308 NY 543.)
The court has considered the pleadings and all of the evidence presented not as a motion for summary judgment but on the question of whether plaintiffs can have a cause of action against the defendants. (See Rovello v Orofino Realty Co., 40 NY2d 633.)
This action arises out of an 11-day strike by the members of the unions representing the employees of the Transit Authority and MABSTOA. The five, union organizations and their respective officers in their respective individual capacities are named as defendants.
Plaintiffs are engaged in the practice of law as a profession, maintaining offices in Manhattan. Plaintiffs sue both individually and on behalf of all other professional and business entities (the class) that were damaged as a consequence of the defendants’ willful disruption of the service provided by the public transportation system of the City of New York.
*460 On April 1, 1980, in violation of an injunction, the members of the defendants’ unions commenced the strike which halted all mass transit in, and paralyzed the life and commerce of, the City of New York. On the eighth day of the strike, the court entered an order finding the unions and certain of their principal officers guilty of criminal contempt for having willfully disobeyed the court’s preliminary injunction by, among other things, “engaging in, causing, instigating, encouraging, condoning, aiding and abetting a strike by employees (of the Transit Authority and MaBSTOA)” and willfully and intentionally failing to instruct the unions’ members not to engage in any strike or other act prohibited by the injunction. Although heavy fines were imposed and the officers were personally adjudged in contempt, and in the face of a further order that the defendant officers instruct their members that they return to work forthwith, the strike continued until April 11, 1980.
By the time the members of the defendant unions had reported to work, the strike had caused widespread disruption of the lives of the citizens of New York City and severe economic damage to its professional and business community.
Public policy, as expressed in both Federal and State law, recognizes the right of labor to withhold its services by way of a strike when management has not agreed to the terms of a contract of hire, referred to generally as a collective bargaining agreement. (Labor Management Relations Act of 1947, US Code, tit 29, § 163; Labor Law, § 700.) Courts have little power to interfere with such right. (Norris-LaGuardia Act, US Code, tit 29, § 101; Labor Management Relations Act of 1947, US Code, tit 29, §§ 160, 178; Labor Law, § 807.) Where employees, however, are those of the State or local government, the policy differs, and strikes are not permitted. (Civil Service Law, § 210.)
In this regard, even Federal policy yields to the paramount State interest. (Matter of State of New York v Fuller, 31 AD2d 71.) Clearly, the policy of noninterference established for the private sector does not apply to the public sector, and strikes by government employees are illegal. *461 The issue here is whether such illegal strikes may also give rise to a private cause of action.
In its first cause of action, which sounds in prima facie tort, plaintiffs allege that the members of the defendant unions willfully and maliciously engaged in the strike and that the parent unions and individual defendants in their individual and representative capacities willfully and maliciously caused, instigated, encouraged and condoned this action by the members; that the strike was knowingly engaged in and was caused, instigated, encouraged and condoned by the union officers and the parent unions in violation of section 210 of the Taylor Law (Civil Service Law, § 210) and Justice Monteleone’s preliminary injunction issued on March 31, 1980; and that it was initiated with the intention and for the purpose of causing foreseeable economic damage to the plaintiffs and members of the class of a magnitude such that representatives of the Transit Authority and MABSTOA and of the City and State of New York would act to terminate the strike. Economic damage to the plaintiffs and the members of the class in the form of both out-of-pocket expenses and lost profits is alleged to have been caused as a result of the alleged willful and malicious conduct of the defendants.
The second cause of action, which sounds in nuisance, realleges the allegations of the first, and further alleges that the strike was engaged in with the intention and for the purpose of causing, and did in fact cause, widespread economic dislocation and substantial interference with the public health, safety, comfort and convenience, thereby creating a nuisance. Plaintiffs and the members of the class are alleged to have suffered damages as a direct and foreseeable result of the strike, consisting of both out-of-pocket expenses incurred in order to conduct their professions and businesses in the face of the illegal strike and lost profits as well. Plaintiffs also seek to recover as third-party beneficiaries of the collective bargaining agreemént between the defendant unions and public employees. Plaintiffs particularly claim the benefit of the no-strike clauses contained in those agreements.
The thrust of defendants’ argument is that public policy precludes a finding that a cause of action has been stated *462 and that the Taylor remedies against strikes by public employees pre-empt traditional common-law causes of action for damages.
The Taylor Law (Civil Service Law, art 14) was enacted by the New York State Legislature upon the recommendation of the Special Committee on Public Employee Relations established by Governor Rockefeller after the devastating mass transit strike of 1966. As its predecessor, the Condon-Wadlin Act, had done, the Taylor Law perpetuated the long-standing prohibition of strikes by public employees. (City of New York v De Lury, 23 NY2d 175, app dsmd 394 US 455.)
That the Taylor Law was not intended to vest in the public employer the exclusive remedy for injury caused by illegal public employee strikes was recognized by the Appellate Division, Second Department, in Caso v District Council 37 (43 AD2d 159).
The plaintiffs in Caso were not the employers of the striking public employees but officials of Nassau County towns who sued in their representative and individual capacities. They brought a common-law action against the unions representing employees of sewage treatment plants in Manhattan and union officers. The unions had engaged in a strike prohibited under the Taylor Law that resulted in the emission of sewage into the East River which subsequently polluted the beaches of Nassau County. The court found that “[t]he purpose of the Taylor Law and the prohibition against public employee strikes, as well as the general welfare of the public, are best served by permitting appropriate redress for violation of the law.” (Caso v District Council 37, supra, p 162.)
The court, in rejecting defendants’ argument that the Taylor Law was not the exclusive remedy that may be applied against it, went on to state that “[r]ead the way the defendants suggest, the Taylor Law would become an impenetrable shield of immunity for public employees who may illegally cause serious damage to persons or parties other than their employer. There is no support for such protection in the statute itself, in the language of the legislative committee which studied the area and drafted *463 the bill, or in reason. Nor is there any wisdom in a decision which puts the ‘right’ of a public union to engage in illegal activities entirely beyond the court’s ability to find suit-: able redress”. (Caso v District Council 37, supra, p 162.)
The court concluded that “[i]n summary, then, the Taylor Law was not intended to provide the exclusive remedies in the event of a strike by public employees. The statute itself states that it is intended to govern employer-employee relationships for the benefit of the public; it does not indicate that it is intended to immunize public employees from all punishment except that meted out by the chief legal officer of the government involved. It is well settled by the cases that the provisions of the Taylor Law are to be liberally construed to effectuate its purpose (see, e.g., Matter of Civil Serv. Employees Assn. v. Helsby, 31 A D 2d 325, 330, affd. 24 N Y 2d 993). The purpose of the Taylor Law is, inter alia, ‘to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government’ (Civil Service Law, § 200). That purpose can best be served by interpreting the Taylor Law provisions as nonexclusive as to remedies against public employees for damages caused by an illegal strike.” (Caso v District Council 37, supra, p 163.)
In an earlier decision in the same case (Caso v Gotbaum, 67 Misc 2d 205, 212, revd on other grounds 38 AD2d 955), the Supreme Court, Nassau County, had expressly held that not only public officials affected by an illegal public employee strike but also “private citizens reasonably affected” have a cause of action for injunctive relief for damages.
Caso was followed in People v Vizzini (78 Misc 2d 1040, 1042) wherein the court rejected the contention of the defendants and “the full complement of municipal unions appearing amicus curiae herein *** that a strike by firemen cannot be the subject of a criminal prosecution because the Legislature intended the Taylor Law *** to provide the exclusive remedy and sanctions for public employee labor disputes.”
The Vizzini court, rejecting the “exclusive remedy” argument, upheld the indictment of the president and two *464 members of the city’s union, Fire Fighters’ Association, for reckless endangerment in the second degree and related crimes arising from their role in calling the first strike of New York’s firemen in history. In doing so, the court found (supra, p 1044) “no concrete indication in the Taylor Law or anywhere else sufficient to immunize conduct in a labor dispute from the enforcement of any criminal statutes”.
The defendants seek to distinguish Caso on two grounds. First, they assert that the status of plaintiffs in Caso as elected public officials gives them a standing to sue not enjoyed by the plaintiff and class members here. This argument was expressly rejected by the Supreme Court in Caso v Gotbaum (supra, p 212) which held that “private citizens reasonably affected” as well as public officials have a cause of action for injunctive relief and damages resulting from illegal public employee strikes. Moreover, the argument suffers a fatal conceptual defect. As noted above, there is absolutely nothing in the statute or any legislative history to support a conclusion that the Taylor Law preempted existing common-law remedies against public employee strikes. Defendants’ argument requires not only a conclusion that the Legislature intended to pre-empt common-law remedies but also the further finding that it intended to except suits by public officials from its preemption with no evidence whatsoever to support a finding of a legislative intention to pre-empt common-law remedies. An argument based upon such an intention, as well as an exception therefrom, is absolutely unfounded.
The defendants also assert that Caso and Vizzini, notwithstanding considerations of public policy, should bar the plaintiffs from maintaining a cause of/action for damages. They argue that allowing private individuals to recover for damages caused by an illegal public employees’ strike would permit an “alien power of coercion” to disrupt New York State’s legislatively created machinery for dealing with public employee labor disputes. This argument was rejected in both Caso and Vizzini. And, of course, the Legislature, New York State’s ultimate declarant of public policy, deemed such private actions to be consistent with the public policy of the Taylor Law when it declined to pre-empt them by making the Taylor Law an exclusive remedy.
*465 The court, having decided that the Taylor Law is not an impenetrable shield which bars recovery against a public union by a private individual, must now determine whether the complaint, which sounds in prima facie tort and public nuisance, is sufficient to state a cause of action.
The roots of the prima facie tort concept lie in the decisions of the court of England. Lord Bowen first articulated the concept in Mogul S.S. Co. v McGregor, Gow & Co. (23 QBD 598, 613, affd [1892] AC 25) stating, “intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person’s property or trade, is actionable if done without just cause or excuse.”
The concept was first recognized in New York State in Advance Music Corp. v American Tobacco Co. (296 NY 79), in which case the New York Court of Appeals adopted the reasoning and language of Justice Holmes in Aikens v Wisconsin (195 US 194). Justice Holmes had written (supra, p 204): ‘[P]rima facie, the intentional infliction of temporal damage is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape.” Advance Music Corp. and subsequent cases make clear the nature of the prima facie tort concept: It makes “actionable an intentional wrong that [does] not classify into any of the formal categories.” (Morrison v National Broadcasting Co., 24 AD2d 284, 290, revd on other grounds 19 NY2d 453.)
That the defendants willfully and maliciously intended to inflict injury on plaintiff and the members of the class as alleged in the complaint is necessarily taken as true on this motion to dismiss. So, too, the complaint allegation that the defendants intentionally and maliciously engaged in the strike for the purpose of causing the plaintiff and the members of the class to suffer economic harm of such magnitude that the Transit Authority, MABSTOA and officials of the State and the City of New York would feel compelled to act to terminate the strike.
In challenging the legal sufficiency of the first cause of action, the defendants therefore point to only two elements alleged to be missing: intent and special damages. Citing *466 Squire Records v Vanguard Recording Soc. (25 AD2d 190) and other cases, the defendants contend that the element of intent embodied in the prima facie concept is not satisfied here because the intent to injure the plaintiff and the members of the class was not the sole motivation for their conduct.
The critical issue concerning the intent element is not whether the harmful act was solely malicious, to the exclusion of any other purpose, but rather whether it was justified by any legal or social purpose. This formulation of the intent element was stated in Opera on Tour v Weber (285 NY 348, 354-355). In weighing a prima facie tort cause of action brought against a striking union for injunctive relief, the Court of Appeals looked not to the subjective purpose of the act, but rather to the legal or social justification of the union activity (Opera on Tour v Weber, supra, pp 355-356): “The self-interest of labor, like the self-interest of any other body, receives immunity only for those objectives which have a legitimate and reasonable relation to lawful benefits which the union is seeking. When the labor objectives are illegal, the courts must control *** By way of illustration, the courts condemn the combined effort of employees to coerce an employer to pay a stale or disputed claim, even though it might be to the self-interest of the striking employees *** [o]r if those engaged in police duty or in the armed forces should conspire in the face of an emergency or otherwise to coerce others to cease maintaining law and order or defense * * * [h]arm done to another or to the public may be countenanced only if the purpose, in the eye of the law is sufficient to justify such harm.”
The recent decision of the Court of Appeals in ATI, Inc. v Ruder & Finn (42 NY2d 454) restates the principles of Opera on Tour (supra) and demonstrates that the element of intent in a prima facie tort action is determined not by the “sole motivation” of the defendant but rather by the legal and social justification for the allegedly tortious conduct. The inquiry is not whether the act was motivated solely by malice, but whether the social desirability of the defendants’ conduct is predominant when weighed against the resulting harm to the plaintiff. Nowhere in its unanimous opinion did the Court of Appeals even discuss the sole *467 motivation test. Instead, the Court of Appeals inquired into the legal excuse or justification for the defendants’ conduct (ATI, Inc. v Ruder & Finn, supra, p 459): “Even if it be true that at least some of the defendants intended to harm plaintiff *** there remains the question of whether their conduct is without excuse or justification. Of course, one can always advance an explanation for one’s conduct but, in this type of case, it must be an excuse or justification which the law will recognize (Advance Music Corp. v American Tobacco Co., 296 NY 79, 85, supra; compare Beardsley v Kilmer, 236 NY 80, with American Bank & Trust Co. v Federal Bank, 256 US 350). Underlying the question of excuse or justification, it has been noted, is the question of whether the public’s gain outweighs the harm to another (see Prima Facie Tort, Ann., 16 ALR3d 1191, 1220-1227).”
Whether the defendants’ intent to harm the plaintiff and the members of the class is excused or justified by their avowed motive is, as the Court of Appeals stated in ATI, Inc. (supra), a function of whether the public’s gain from the defendants’ avowed motive outweighs the harm to the plaintiff and the members óf the class. (ATI, Inc. v Ruder & Finn, supra, p 459.) The answer to this question was given by the New York State Legislature when it codified the long-standing common-law rule in enacting the Taylor Law: strikes by public employees, whatever their purpose, are unlawful acts because of their inherently adverse effect upon the public. The defendants cannot maintain, in the face of this authoritative legislative declaration, that their conduct serves any socially justifiable purpose.
These consistent declarations of public policy initially made by the courts of the State and therefore by its Legislature as well cannot be overcome by the defendants’ invocation of a self-interested motive. The committee that drafted the Taylor Law stated specifically in its final report (Public Papers of Governor Rockefeller, 1966, p 891) that: “Careful thought about the matter shows conclusively, we believe, that while the right to strike normally performs a useful function in the private enterprise sector (where relative economic power is the final determinant in the making of private agreements), it is not compatible with *468 the orderly functioning of our democratic form of representative government (in which relative political power is the final determinant).”
Defendants seek to immunize illegal means by pointing to the desirability of the end they hope to gain. This they may not do.
The Transport Workers Union (TWU) argues that its strike was directed at its employer and that, as a consequence, it is not liable to any other person. This is specious. Although the actual intent and purpose of the TWU strike can only be determined at trial, it is generally recognized that the public union strikes are necessarily aimed at the public, not the public employer. (See, e.g., 1966 Taylor Committee Report, pp 20-22; Report of the Select Joint Legislative Committee on Public Employee Relations, Legis Doc No. 14 [1969], pp 50-51.) Since a public employer cannot engage in a lockout or go out of business, these options available to private sector employers which serve to temper union militancy are absent in the public sector. The TWU’s transit strike was aimed at the members of the public depending upon public transportation in the hope that those persons would pressure the public employer to make bargaining concessions. In order to escape liability for its intentional wrongful conduct, the TWU must justify its strike, i.e., it must demonstrate that the public’s gain outweighed the harm to the plaintiff and the members of the class inflicted by the strike. This, defendants have failed to prove.
The defendants’ reliance on Jamur Prods. Corp. v Quill (51 Misc 2d 501) is misplaced. Although one cause of action in Jamur was founded upon the theory of prima facie tort, the court there ignored that theory and instead framed the issues in traditional negligence concepts, stating (p 507) that the sufficiency of the cause of action “necessarily depends upon whether a duty exists, and if so, to whom that duty is owed.” This inquiry, although appropriate in a negligence action, is inappropriate in a prima facie tort action. The Jamur court fails to explain the applicability of the traditional negligence test to the legal sufficiency of a prima facie tort cause of action. Moreover, Jamur’s characterization of the illegal strike as the union’s “most substan *469 tial, and perhaps only effective weapon” (supra, p 505) cannot be harmonized with the absolute rejection of the strike in the Taylor Law. It is therefore no surprise that Jamur was not merely distinguished but critized as well in Caso v District Council 37 (43 AD2d 159, supra). The court there distinguished Jamur, noting that the conduct of the defendants in Caso v District Council 37 (supra, p 163) “was wilful and malicious, while in Jamur, decided under the Condon-Wadlin Act, the damage was more tangential, only secondarily causing the damages claimed by the businessmen.” The Second Department, in Caso, also rejected the assumption underlying the Jamur decision that injury to the plaintiffs was an unforeseeable consequence of a strike by transit workers, concluding (p 163) instead that “[t]he assumption in Jamur that the risk of damage in the subway strike was unforeseeable should be rejected, since it is the very inevitability of extensive damage which led to the prohibition of public strikes.”
The court finds that the first cause of action sufficiently pleads the elements of intent and foreseeability. The complaint’s allegations that the defendants’ conduct was willfully malicious* must be taken as true on this motion.
The illegality of the strike has already been adjudicated in litigation to which these defendants were parties, thus collaterally estopping them from relitigating the question here. That the illegal strike was undertaken in defiance of both a statute and injunction prohibiting a strike attests to the willful and malicious nature of the defendants’ conduct. Moreover, the Legislature, in its prohibition of public employees’ strikes, has foreclosed inquiry into the existence of legal justification for the strike. Finally, that the injury sustained by the plaintiff and the members of the class was a direct and immediate and foreseeable consequence of the strike must not only be taken as true on this motion but was, in fact, resolved by the Second Department’s recognition in Caso that it was the very inevitability of grave injury that led to the prohibition of public employees’ strikes..
*470 Another necessary element of a complaint in an action based upon “prima facie tort” is a statement of reasonably identifiable losses which were suffered by the plaintiff. (Best Window Co. v Better Business Bur. of N.Y. City, 2 Misc 2d 55.) Such special damage must include injury beyond that suffered by the public at large. (Graceland Corp. v Consolidated Laundries Corp., 7 AD2d 89, 91, affd 6 NY2d 900.) The court finds that plaintiffs’ complaint properly alleges items of special damages in the form of loss of business from the date in question. This is a matter of record that can be established by documentary proof if, in fact, it exists. (Catalano v Capital Cities Broadcasting Corp., 63 Misc 2d 595.) The complaint alleges that plaintiff and members of the class suffered economic harm in two distinct ways. First, economic harm is alleged to have occurred as a result of the out-of-pocket expenses that the plaintiff and members of the class were forced to incur merely in order to remain able to practice their professions and to operate their businesses in the face of the illegal strike engaged in by the defendants. Included in this allegation are such items of damage as the expense of providing alternate transportation for employees. Second, economic harm is alleged to have occurred in the form of profits that plaintiff and other professional practices and businesses failed to realize because of the disruption caused by defendants’ actions. (See McCullough v Certain Teed Prods. Corp., 70 AD2d 771.)
The second cause of action seeks recovery of damages on the theory that the “widespread economic dislocation and damage and substantial interference with the public health, safety, comfort and convenience” caused by the defendants’ willful and malicious conduct created a nuisance that resulted in foreseeable and particular pecuniary injury to the plaintiff and the members of the class.
The definition of a nuisance was set forth in Copart Inds. v Consolidated Edison Co. of N. Y. (41 NY2d 564, 568): “[A public nuisance] consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all * * * in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons”.
*471 The court went on to make a critical point with respect to the tort of nuisance, saying (p 569): “nuisance, as a general term, describes the consequences of conduct, the inconvenience to others, rather than the type of conduct involved (2 NY PJI 653). It is a field of tort liability rather than a single type of tortious conduct (Prosser, Torts [4th ed], p 573).”
That the consequences of a strike by public employees or employees providing essential services may constitute a public nuisance is recognized in New York State. In affirming the grant of a preliminary injunction enjoining a strike by nursing home employees in Nassau County, the Second Department, in State of New York v Local 1115 Joint Bd. (56 AD2d 310), relied in large part on the concurring opinion in Steelworkers v United States (361 US 39) as common-law support for the injunction based upon the potential harmful consequence of a strike (State of New York v Local 1115 Joint Bd. supra, p 318): “Justices Frankfurter and Harlan, in their concurring opinion in United Steelworkers v United States (361 US 39, 61) held that public nuisances might be enjoined at the suit of the Attorney General at common law *** and that a public nuisance included a strike imperilling health or safety.”
A recent decision of the Tennessee Court of Appeals (Fulenwider v Fire Fighters Assn. Local Union 1784, CCH Public Bargaining Cases, par 36,956, p 37,756) affirmed the sufficiency of a nuisance cause of action for damages suffered as a consequence of an illegal strike by firemen in the City of Memphis. The plaintiff, whose living quarters had been destroyed by fire during the period of the strike, alleged that his loss was caused by the inadequacy of fire protection, which was in turn caused by the defendant fire fighters and their union’s conduct in indorsing the strike and failing to end it. The Tennessee Court of Appeals, after reviewing nuisance cases, held (p 37,758) that: “The complaint alleges facts from which it could be concluded that the defendants by calling or endorsing the strike, an illegal act, have created a condition which could be found to be a public nuisance *** It has long been the rule that a citizen who has suffered an injury different in kind from that suffered by the public by virtue of the public nuisance may maintain an action to recover his special damages.”
*472 The common thread running through the venerable nuisance doctrine, the New York labor cases discussed above and the recent Tennessee case, is summarized by the author of the note Private Damage Actions against Public Sector Unions for Illegal Strikes (91 Harv L Rev 1309, 1328-1329): “Activities which constitute public nuisances include those that interfere with the public’s health, peace, safety, morals, comfort, or convenience. Certainly, most public sector strikes interfere with one of these interests of the public as much as traditionally recognized public nuisances. The public safety implications of a strike by police or firemen, for example, would seem to be more serious than shooting fireworks in a public street. The dangers to the public health posed by a sanitation workers’ strike in a densely populated urban area would be greater than those posed by the keeping of diseased animals. And the inconvenience that results from a transit workers’ strike is no less than that caused by the classic public nuisance of the obstruction of a public highway.”
The defendants do not dispute the plaintiffs’ allegations that their conduct created a public nuisance; their sole challenge to the sufficiency of plaintiffs’ second cause of action is on the ground that it fails to allege special damages. (Stevenson v East Ohio Gas Co., 47 Ohio L Abs 586; Smedberg v Moxie Dum Co., 148 Me 302; Swanson v Mississippi & Rum Riv. Boom Co., 42 Minn 532.) The defendants thus raise the often-litigated issue of whether damages caused by a public nuisance should be sufficiently particular to support a cause of action.
The law of New York State on this issue was set forth in Copart Inds. v Consolidated Edison Co. of N. Y. (41 NY2d 564, 568, supra), where the Court of Appeals restated the requirement, “although an individual cannot institute an action for public nuisance as such, he may maintain an action when he suffers special damage from a public nuisance”.
It is no objection that damages are sought on a class basis. Professor Prosser states (Prosser, Private Action for a Public Nuisance, 52 Va L Rev 997,1008-1009): “Notwithstanding some aberrations in a few early cases, particular *473 damage certainly does not mean damage peculiar, exclusive or unique to the plaintiff. It has often been held that the fact that other individuals suffer the same kind of damage, and even in greater degree, does not prevent any of them from recovering for it. A considerable class of persons, such as landowners near a factory who are inconvenienced in their dwellings by its dust, smoke and odors, may sue and recover. It is only when the class becomes so large and general as to include all members of the public who come in contact with the nuisance, that the private action will fail.”
Thus, it is as true today as it was in 1829 that “a party who has done a criminal act can not defend himself against a private suit by alleging that he injured many others in the same way”. (Lansing v Smith, 4 Wend 9,25.) In Francis v Schoellkopf (53 NY 152, 154-155) it was held that: “[0]ne erecting or maintaining a common nuisance is not liable to an action at the suit of one who has sustained no damage therefrom except such as is common to the entire community, yet he is liable at the suit of one who has sustained damage peculiar to himself. No matter how numerous the persons may be who have sustained this peculiar damage, each is entitled to compensation for his injury.”
One category of pecuniary loss which has long been recognized as sufficiently particular damage to sustain a nuisance cause of action occurs when one is prevented from performing a contractual obligation on which he would have made a profit, in which event the lost profits are recoverable in an action for damage. (Prosser, Private Action for a Public Nuisance, 52 Va L Rev 997, 1013; Knowles v Pennsylvania R.R. Co., 175 Pa 623.) But even where pecuniary damage results from something other than a frustrated contractual right, it has been sustained as sufficiently particular damage. Professor Prosser observes (52 Va L Rev 997, 1013-1015) that pecuniary damage suffered to one’s business is sufficient to sustain a nuisance cause of action: “[W]here an established business [makes] commercial use of the public right with which the defendant interfered. Thus when a river is blocked, a steamboat line operating boats upon it, or a company engaged in rafting logs or collecting tolls for passage, has *474 been permitted almost without question to maintain the action. There are several cases in which commercial fisheries making a localized use of public waters have been allowed to recover where the ordinary citizen deprived of his occasional Sunday piscatorial pleasures could not do so. But even where the business is not itself founded upon the exercise of the public right, interference with a public right which causes harm to the business, as by blocking access to a shop which deprives it of customers, or interference with transportation which prevents a business or establishment from obtaining materials or labor, or from shipping its goods to market, has been held to cause such particular damage that the action can be maintained.”
Wakeman v Wilbur (147 NY 657) is an example of the New York rule which recognizes such pecuniary damage as constituting special damage. In Wakeman, the obstruction Of a public highway by the defendant compelled the plaintiff to expend extra sums to carry on his business. The obstruction was held to be (supra, p 664) “no doubt, an offense against the public, but *** none the less, in a special and peculiar sense, an injury to the plaintiff.”
The strike was an offense against the public generally. However, as in Wakeman, the pecuniary injury allegedly suffered by the plaintiff and the class was different from that suffered by the public at large. That such injuries were special and peculiar to the plaintiff and the class members is demonstrated by both the nature of their reliance on the system of public transportation for the conduct of their professions and businesses for profit (as distinguished from the general public’s reliance) and by the amount of injury that they suffered (as contrasted with that suffered by the general public) as a consequence of the defendants’ willful and malicious interference with the public right.
The injury common to the public at large was essentially the inconvenience resulting from the disruption in daily patterns and routines. Millions of the city’s residents were compelled to resort to more arduous or time-consuming means of travel within the City of New York or to forego such travel. The injury common to the public at large also included potential harm that befell each citizen, such as *475 shortages of blood caused by the inability of donors to travel to blood banks, the impaired efficiency of emergency medical services due to the increased traffic in the streets and the city’s wholesale commitment of police officers to traffic control and away from crime-prevention patrol.
By contrast, the pecuniary damage to plaintiff and the members of the class resulting from the defendants’ actions was particular to professional and business enterprises operating for profit. Those pecuniary damages occurred in two forms as alleged in the complaint, first, in the form of substantial out-of-pocket expenses incurred merely in order to carry on their professional practices and businesses in the face of an illegal strike and, second, pecuniary damages in the form of lost profits.
Because the damages suffered by the plaintiff and the members of the class as a result of the public nuisance created by the strike were direct, foreseeable and substantially different in kind from the potential injury to which the general public was exposed, the motion to dismiss the plaintiffs’ second cause of action, sounding in nuisance, is denied.
Plaintiffs also seek recovery as a third-party beneficiary of the collective bargaining agreement between defendant unions and the public employers. Plaintiffs particularly claim the benefit of the no-strike clauses contained in those agreements. Historically, New York has been in the vanguard of the development of the third-party beneficiary doctrine. The doctrine itself had its American genesis in Lawrence v Fox (20 NY 268). Subsequent cases have applied this principle to contracts where one of the parties was a governmental entity. (See, e.g., Pond v New Rochelle Water Co., 183 NY 330; Kornblut v Chevron Oil Co., 62 AD2d 831, affd 48 NY2d 853.) Extensive research by the court has failed to disclose any New York case where a public sector union breached an explicit no-strike clause of a contract which explicitly referred to protecting the interests of those who utilize the public service. In this regard, the facts before the court are highly unusual.
The critical injury in third-party beneficiary claims is whether the contracting parties intended their contract to *476 benefit third parties. The best evidence of such intent is language in the agreement to that effect. The TWU’s agreement states one of its purposes is “[t]o assure to the people of the State of New York efficient, economic, sufficient and dependable transportation service * * * and to protect the interests of the public” (Agreement, art 1A). The TWU has also agreed “to cooperate with the authorities in a joint effort to place and keep the transit system on a safe, efficient, economical operating basis” (Agreement, art 4).
As a member of the public which depends on the public transit system and which employs dozens of persons who need the public transit system to get to and from work, plaintiffs argue that they are within the class of persons for whose benefit the TWU has promised to provide “dependable transportation service”. (See Kornblut v Chevron Oil Co., supra.)
A person not a party to a contract may sue for damages resulting from nonperformance if the contract demonstrates that its primary intent was to benefit that person. (Bernal v Pinkerton's Inc., 52 AD2d 760, affd 41 NY2d 938; see Port Chester Elec. Constr. v Atlas, 40 NY2d 652, 655; cf. Wright v Herb Wright Stucco, 72 AD2d 959.) Such cannot be said to be the case here. Where, as here, the government agency contracts for services which it bears no obligation to provide to the public, no duty can be found against the promisor on behalf of the member of the public unless the contract clearly makes the promisor answerable to that person for the breach. This, the court does not find. (Moch Co. v Rensselaer Water Co., 247 NY 160, 164.) The decision in Kornblut v Chevron Oil Co. (62 AD2d 831, affd 48 NY2d 853, supra) is not to the contrary. There, the third-party benefit was found to be the fees which defendant agreed to charge members of the public in its contract with the government agency, since the contract permitted a member of the public to enforce that provision. (Kornblut v Chevron Oil Co., supra.) All other “consequential” damages could not be recovered under any theory of breach of contract since the contract did not permit enforcement by any member of the public. (Kornblut v Chevron Oil Co., supra, pp 836-837.) Therefore, no cause of action lies in breach of contract.
*477 Defendants Amalgamated Transit Union, AFL-CIO (ATU) and George Link, its international vice-president, have submitted a separate brief in support of their motion to dismiss the complaint.
These defendants raise several issues which are unique to them and will be discussed by the court.
It is alleged in paragraph 11 of the complaint that the defendant George Link, acting in concert with other defendant union officers, “caused, instigated, encouraged and condoned the strike.” In paragraph 13, it is alleged that the strike was “caused, instigated, encouraged and condoned by the union officers and the parent union *** with knowledge of the illegality of such actions under section 210 of the Taylor Law and the order of preliminary injunction”. It is further alleged in paragraph 14 that the union officers and the parent unions, acting illegally and in concert, caused, instigated and encouraged the strike “with the intention and for the purpose of causing economic harm to the plaintiff and the members of the class of a magnitude such that representatives of the NYCTA and MABSTOA and of the City of New York would act to terminate it.”
Because defendants ATU and its officer, George Link, are alleged to have acted unlawfully and in concert with other defendants, the absence of allegations to the effect that the ATU is a collective bargaining representative of the striking workers and that the ATU is a party to any agreements with the Transit Authority or MABSTOA is irrelevant.
Furthermore, the ATU and Link are collaterally es-topped from relitigating here the issues of their complicity in the illegal strike. The same issues were raised by them before Justice Monteleone in their attempt to evade the imposition of fines for their violation of the Taylor Law. In imposing additional fines on the ATU, Justice Monteleone found both that the defendant Link failed to disassociate himself from the striking employees and that the ATU had failed to comply with the court’s order that the ATU instruct its local striking members to return to work. (New York City Tr. Auth. v Lindner, NYLJ, July 3, 1980, p 13, col 3.)
*478 The defendants’ argument that the court lacks jurisdiction over them because the complaint fails to name the ATU as a defendant in accordance with section 13 of the General Associations Law is laid to rest by United Min. & Chem. Corp. v United Mechanics’ Union Local, 150 F (43 Misc 2d 877). The court there held that when any union officer specified in section 13 of the General Associations Law as a proper recipient of summons and complaint is served with a summons and complaint in an action against a union organization “failure to name the president or treasurer constitutes a mere irregularity” and does not deprive the court of jurisdiction. Since Link was personally served with a summons and complaint in this action and as vice-president of the ATU is one of the officers designated in section 13 as a proper person to be served, the failure to name the president or treasurer of the ATU as a defendant is a mere irregularity that does not deprive the court of jurisdiction over either the ATU or Link.
Nor is the complaint rendered defective by the absence of an allegation that the entire membership of the ATU approved or ratified the ATU’s complicity in the illegal strike. The ATU had the opportunity to disassociate itself from the illegal activity of its local divisions and of the other defendants. That it chose not to do so but instead caused its vice-president, Link, to continue to serve as a member of the defendant unions’ negotiating team until the strike ended confirms the ATU’s tacit approval and ratification of his conduct. Moreover, to permit a union organization with the breadth of membership of the ATU to win dismissal of a complaint upon the ground that the plaintiffs have not alleged approval or ratification by every single member of its far-flung domestic and foreign membership would amount to a grant of total immunity against suits for injuries alleged to have been caused by their unlawful conduct.
The First Department rejected this argument out of hand, albeit in a different context, in Matter of New York Times Co. (Newspaper Guild of N.Y.) (2 AD2d 31, 33), saying: “Oncé an agent has been designated for collective bargaining purposes, the membership it represents cannot assume to reject certain acts of its bargaining representa *479 ti ves and accept others. To hold otherwise would make a shambles of all labor negotiations”. Just as a union organization cannot reject certain acts of its bargaining representative and accept others, the ATU cannot disassociate itself from any responsibility for the acts of its vice-president who actively participated in the illegal strike as a designated representative of the ATU.
The ATU’s argument that Federal statutes pre-empt this action is also without merit. It has been repeatedly recognized that the Federal statutes governing labor relations do not apply to labor relations between State and local governments and their employees. (State v Brotherhood of R.R. Trainmen, 37 Cal 2d 412, cert den 342 US 876.) Moreover, the Supreme Court has refused to hold State remedies pre-empted by the Federal labor laws where the activity of labor organizations (Vaca v Sipes, 386 US 171, 180) “ ‘touch[es] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress has deprived the States of the power to act.’ ”
Just as the States have been permitted to award damages for union activity that is marked by violence (e.g., Automobile Workers v Russell, 356 US 634) because of the compelling State interest involved, damage actions arising out of illegal strikes by public employees are matters of State concern that the States are free to litigate. By participating through its officer, Link, in the unlawful strike instigated and participated in by the defendant unions, the ATU forfeited any claim of immunity from State regulations under the Federal pre-emption doctrine.
Accordingly, the allegations of the complaint sounding in prima facie tort and public nuisance are sufficient against the defendants ATU and Link, as they are against the other defendants.

 In Brown v Garey (267 NY 167, 170), the Court of Appeals defined a willful and malicious act as: “A wrongful act done intentionally which necessarily causes harm and is without just cause or excuse”.