50

Burns Jackson Miller Summit & Spitzer, Individually and on Behalf of All Others Similarly Situated, Respondent, v William Lindner et al., Appellants. (Action No. 1.)

Jackson, Lewis, Schnitzler & Krupman, Respondent-Appellant, v Local 100, Transport Workers Union of America et al., Appellants-Respondents. (Action No. 2.)

Second Department, July 6, 1982

**APPEARANCES OF COUNSEL**

*Reilly, Fleming & Reilly* (*Joseph T. Gatti* and *Paul G. Reilly, Jr.,* of counsel), for Amalgamated Transit Union, AFL-CIO and another, appellants.

*Stephen D. Hans* (*Allan Wollin* and *Leonard B. Isaacs* of counsel), for Amalgamated Transit Union Locals 726 & 1056, appellants.

*O'Donnell & Schwartz* (*Asher W. Schwartz* and *Malcolm A. Goldstein* of counsel) and *Bredhoff & Kaiser* (*Julia Penny Clark, Michael H. Gottesman* and *David M. Silber-man* of counsel), for Local 100 Transport Workers Union, appellants-respondents (one brief filed).

*Burns Jackson Summit Rovins Spitzer & Feldesman* (*Stuart A. Summit, Guy R. Fairstein* and *Richard A. Zansitis* of counsel), respondent *pro se*.

*Jackson, Lewis, Schnitzler & Krupman* (*Anthony H. Atlas* and *Andrew A. Peterson* of counsel), respondent-appellant *pro se*.

*Mid-Atlantic Legal Foundation, Inc., Consumer Alert, John P. McGlone* and *David Bustamonte* (*John G. Collins* of counsel), *amici curiae*.

*Colleran, O'Hara, Kennedy & Mills, P.C.* (*Richard L. O'Hara, Robert A. Kennedy, Victoria Quesada* and *Vincent F. O'Hara* of counsel), for New York State, AFL-CIO, *amicus curiae*.

*Beverly Gross* (*Harold L. Fisher, Murray Gordon, William H. Frappollo, Ann Hoffman, Nancy Hoffman, James R. Sandner* and *David Stein* of counsel), for Municipal Labor Committee, *amicus curiae*.

### OPINION OF THE COURT

GULOTTA, J.

These consolidated actions against the Transport Workers Union of America, AFL-CIO (TWU) and the Amalgamated Transit Union, AFL-CIO (ATU) their affiliated locals and their respective officials were brought in the aftermath of the 1980 transit strike.

I

A. Action No. 1

The complaint in Action No. 1, brought by the law firm of Burns Jackson Miller Summit and Spitzer on behalf of themselves and all other professional and business entities similarly situated,[1] sets forth two causes of action, the first of which sounds in prima facie tort, and the second of which is predicated on public nuisance. The first cause of action alleges that at or about 12:01 A.M. on April 1, 1980, the local unions and their members willfully and maliciously engaged in an illegal strike against their respective public employers, and that the other named defendants, also acting willfully and maliciously, caused, instigated, encouraged and condoned the said strike. The strike was

---

1. Class action certification has not been sought nor granted at this time.

alleged to be in violation of both section 210 of the Civil Service Law and a preliminary injunction issued on March 31, 1980 by the Supreme Court, Kings County (MONTELE-ONE, J.), of which the defendants had knowledge, and was undertaken for the purpose of causing economic damage to the plaintiff (and other class members) of so great a magnitude that the authorities and other governmental officials "would [be compelled to] act [i.e., make contract concessions, in order] to terminate it". It was further alleged that the strike did, in fact, cause the plaintiff (and other class members) economic damage by causing them to "expend substantial sums of money merely to remain able to practice their professions and to operate their businesses in the face of the disruption intentionally inflicted upon them by the defendants as a foreseeable consequence of their illegal actions". The strike also allegedly caused the plaintiff (and other class members) to suffer economic injury in the form of lost profits which they would otherwise have realized. Damages to class members, including the plaintiff, allegedly exceeded $50,000,000 a day for each day of the strike.

The second cause of action sounds in public nuisance, and alleges that the defendants instigated and engaged in the underlying strike intending to cause and causing widespread economic dislocation and damage to and substantial interference with, the public health, safety, comfort and convenience of persons within the New York City metropolitan area, thereby creating a nuisance. In addition to the general economic dislocation and damage to the public health, safety, comfort and convenience, plaintiff and other class members also allegedly suffered additional damages resulting from the necessity of incurring large out-of-pocket expenses merely to remain able to continue to practice their professions and operate their businesses during the pendency of the strike, as well as loss of substantial profits during its duration. Damages under the second cause of action were also alleged to have exceeded $50,000,000 a day.

B. Action No. 2

Action No. 2 was commenced in New York County by a second law firm, Jackson, Lewis, Schnitzler and Krupman,

and alleges six causes of action, the first of which asserts a "private" right of action arising out of the defendants' violation of the Taylor Law and Justice MONTELEONE'S injunction. Thus, the amended complaint alleges that the purpose of these prohibitions included the protection of the public, including the plaintiff, from losses and damages resulting from public employee strikes, and claims individual damages (on a beneficiary-type theory) of $25,000 for strike-related losses.

The second cause of action sounds in prima facie tort, and alleges that the defendants willfully, intentionally, maliciously and without justification engaged in the illegal strike and, as a foreseeable result thereof, inflicted economic and financial damage upon the plaintiff during its pendency. No particular dollar amount of damages was alleged in this cause of action.

The third cause of action sounds in tortious interference with the plaintiff's business, and alleges that the "Defendants, by their illegal strike, have intentionally and maliciously interfered with the business of the plaintiff, for which plaintiff is entitled to general and punitive damages as well as special and compensatory damages."

The fourth cause of action sounds in malice or intentional tort and alleges that the "Defendants, by their illegal strike, have willfully, maliciously and tortiously injured plaintiff thereby entitling plaintiff to general and punitive damages, as well as special compensatory damages."

The fifth cause of action is somewhat similar to the first and alleges a tortious conspiracy to violate the Taylor Law. In it, the plaintiff requests general and special damages in the amount of $25,000, as well as general and punitive damages in an unspecified amount.

The sixth and final cause of action sounds in breach of contract, and is predicated on the underlying collective bargaining agreements of which the plaintiff maintains it is a third-party beneficiary. The amended complaint alleges special damages in the amount of $25,000 as a result of this breach.

## C. The Motions to Dismiss

By notice of motion dated July 3, 1980 several of the codefendants in Action No. 1 moved to dismiss the complaint in that action due to the plaintiff's alleged failure to state a cause of action. During the pendency of that motion, all of the parties to both actions entered into a written stipulation to consolidate the two actions in the Supreme Court, Queens County, upon certain terms and conditions, and by order dated August 6, 1980, the Supreme Court, Queens County (RODELL, J.), approved the consolidation. Pursuant to the stipulation, the July 3 motion to dismiss was deemed to be directed against the complaints in *both* actions, and not long thereafter, the remaining (i.e., non-moving) defendants, the Amalgamated Transit Union and George Link, also moved to dismiss. Unfortunately, none of the papers in support of either of these motions has been included in the record on appeal, which does, however, contain the opposition papers of Thomas C. Greble, Esq. of Jackson, Lewis, Schnitzler & Krupman.

In his affidavit, Greble recounts the history of the actions, and then goes on to assert that the two complaints state different, although concededly related, causes of action. The amended complaint in Action No. 2, however, names as defendants only the TWU and its officers, as the plaintiff therein decided to focus upon this union because of its "historical militancy and strike orientation, * * * unusual provisions in its collectively negotiated agreement, and its unique position to cause financial harm and loss to third parties by shutting down New York City's public transit system". Greble then outlined the TWU's participation in other illegal strikes (notably, the 1966 transit strike), its subsequent threats to strike, its recent participation in the underlying (1980) strike, its open defiance of a court-ordered injunction, its apparent intransigence in the face of a $750,000 fine and its well-known, publicly announced policy of "no contract, no work". In addition, Greble noted that the TWU's collective bargaining agreement contains a specific "no-strike" provision, as well as more general language in its declaration of purpose which recognizes its obligation to provide uninterrupted service:

"The Authorities and the Union, in signing this agreement, are governed by their desires and obligations:

"A. To assure to the people of the City of New York efficient, economical, safe *and dependable* transportation service.

"B. To provide hourly paid employees of the Authorities and covered Clerical employees of the Operating Authority with wages, hours, working conditions and grievance procedures.

"C. *To protect the interest of the public* through a definite understanding of the respective rights, *duties,* privileges, responsibilities, and obligations of the Authorities, the employees, and the Union." (Emphasis supplied.)

The affidavit concludes as follows:·

"Considering the strategic ability of the TWU to shut down New York City's transit system, coupled with the union's militant history of illegal strikes and strike threats, and the failure of existing statutory and judicial remedies to achieve the Legislature's stated objective of assuring uninterrupted public services, the Court is urged to hold that the amended complaint states one or more causes of action against the TWU. Experience has shown that an additional, supplementary remedy of a private damage action is needed to deter the TWU from striking and to vindicate this state's strong policy against public sector strikes.

"WHEREFORE, for all of the foregoing, as well as the arguments and authorities set forth in the accompanying Memorandum of Law, the motion to dismiss Jackson, Lewis's amended complaint should be denied".

D. The Decision at Special Term

In his decision (reported at 108 Misc 2d 458), the Justice presiding at Special Term (KASSOFF, J.), held, *inter alia,* that, for the purposes of these motions to dismiss the complaint, the defendants must be deemed to have conceded every fact pleaded in the complaints and every favorable inference that may be reasonably drawn therefrom. The court then stated that while public policy generally recognizes the right of labor to withhold its services, an exception exists in the area of public employment.

Turning to the complaint in Action No. 1, the court relied on this court's decision in *Caso v District Council 37, Amer. Federation of State, County & Municipal Employees, AFL-CIO* (43 AD2d 159) to hold that the sanctions provided in the Taylor Law were not the *exclusive* remedy for any and all injuries caused by an illegal public employee strike, and found, *inter alia,* that the elements of intent and special damage were sufficiently pleaded to sustain the first cause of action, i.e., for prima facie tort. The second cause of action (for public nuisance) was also sustained by the court, Justice KASSOFF concluding that the allegations of loss relating to out-of-pocket expenses and lost profits were legally sufficient to satisfy the "special damages" requirement. In Action No. 2, however, the court rejected the sixth cause of action of the amended complaint by holding (108 Misc 2d, at p 476): "A person not a party to a contract may sue for damages resulting from nonperformance if the contract demonstrates that its primary intent was to benefit that person. (*Bernal v Pinkerton's Inc.,* 52 AD2d 760, affd 41 NY2d 938; see *Port Chester Elec. Constr. v Atlas,* 40 NY2d 652, 655; cf. *Wright v Herb Wright Stucco,* 72 AD2d 959.) Such cannot be said to be the case here. Where, as here, the government agency contracts for services which it bears no obligation to provide to the public, no duty can be found against the promisor on behalf of the member of the public unless the contract clearly makes the promisor answerable to that person for the breach. This, the court does not find. (*Moch Co. v Rensselaer Water Co.,* 247 NY 160, 164.) The decision in *Kornblut v Chevron Oil Co.* (62 AD2d 831, affd 48 NY2d 853, *supra*) is not to the contrary. There, the third-party benefit was found to be the fees which defendant agreed to charge members of the public in its contract with the government agency, since the contract permitted a member of the public to enforce that provision. (*Kornblut v Chevron Oil Co., supra.*) All other 'consequential' damages could not be recovered under any theory of breach of contract since the contract did not permit enforcement by any member of the public. (*Kornblut v Chevron Oil Co., supra,* pp 836-837.) Therefore, no cause of action lies in breach of contract."

The court then considered and rejected certain other contentions raised separately by the ATU in Action No. 1 and, while not specifically addressing any of the remaining causes of action, issued an order denying the motions, except insofar as they affected the sixth cause of action of the amended complaint in Action No. 2, which was dismissed. These cross appeals followed.

## II

It is important to note at the outset that in *Caso v District Council 37, Amer. Federation of State, County & Municipal Employees, AFL-CIO* (43 AD2d 159, *supra*), this court merely determined that the sanctions imposed by the Taylor Law for public employee strikes were not exclusive, and that the comprehensive scheme of injunctions, loss of pay, and the unions' loss of dues check-off privileges simply reflected "the Legislature's attempt to delicately balance the rights of public employees against those of their employers" (*supra,* at p 161). The Taylor Law, we stated, "was intended to monitor employer-employee relationships [in the public sector] and not public employee relations with the public" (*supra,* at p 161). We therefore concluded that the plaintiffs, who were not the employers of the striking public employees, could maintain a common-law cause of action for damages caused by that illegal strike.

The *Caso* action, however, was predicated on the theory of public nuisance, which is only one of the claims asserted in the actions presently before us. Moreover, the *Caso* court specifically declined to rule on the question of whether the complaint in that action was sufficient to state a cause of action in public nuisance or under any other theory, and was not presented with the question of whether to recognize an implied *private* right of action for an alleged violation of the Taylor Law. We must reach these questions on the present appeals.

 In our view, the complaints must be dismissed in their entirety.

## III

The first cause of action of the amended complaint in Action No. 2 asserts a claim which is not predicated upon the alleged violation of any common-law concept of duty,

but rather upon an alleged violation of the Taylor Law itself. Fortunately, however, the relevant criteria for determining whether a private right of action may be inferred from the violation of a statute not expressly providing for one has only recently been discussed by the United States Supreme Court in *Cort v Ash* (422 US 66, 78), a case which has been held to be reflective of New York law in this area (see *Manfredonia v American Airlines,* 68 AD2d 131, 139).

The first criterion listed in *Cort v Ash* (*supra,* p 78) is whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted' " (see *DiCaprio v New York Cent. R.R. Co.,* 231 NY 94, 97; *Motyka v City of Amsterdam,* 15 NY2d 134, 139). Accordingly, we must first determine for whose benefit the Taylor Law was enacted. The answer may be found in section 200 of the Civil Service Law, which pertinently provides as follows: "The Legislature of the state of New York [hereby] declares that it is the public policy of the state and the purpose of this act to promote harmonious and cooperative relationships between government and its employees *and to protect the public* by assuring, at all times, the orderly and uninterrupted operations and functions of government. These policies are best effectuated by [*inter alia*] * * * continuing the prohibition against strikes by public employees and providing remedies for violations of such prohibition." (Emphasis added.) In *Caso v District Council 37, Amer. Federation of State, County & Municipal Employees, AFL-CIO* (43 AD2d 159, 163, *supra*), we similarly held that the Taylor Law "is intended to govern employer-employee relationships for the benefit of the public". Thus, the general public was clearly an intended beneficiary of the act.

This much established, it remains to be determined whether a statute intended to benefit the *entire* public may be held to imply a *private* right of action for its alleged violation. The New York cases on this question appear to go both ways. In *Steitz v City of Beacon* (295 NY 51), for example, the Court of Appeals affirmed the dismissal of a complaint which sought to recover damages based on the defendants' alleged failure to provide adequate fire protection and water pressure as required by statute. The court

held (p 56): "Such enactments do not import intention to protect the interests of any individual except as they secure to all members of the community the enjoyment of rights and privileges to which they are entitled only as members of the public. Neglect in the performance of such requirements creates no civil liability to individuals (Restatement of Torts, § 288; *Moch Co.* v. *Rensselaer Water Co., supra; Taylor* v. *Lake Shore & Mich. S. Ry.,* 45 Mich. 74; *Frontier Steam Laundry Co.* v. *Connolly,* 72 Neb. 767; cf. *City of Rochester* v. *Campbell et al.,* 123 N. Y. 405, and *Troeger* v. *Prudential Insurance Co. of America,* 154 Misc. 537, which cites Restatement of Torts, § 288). The rule is well stated in *Hayes* v. *Michigan Central R. R. Co.* (111 U. S. 228, 240)." However, in *Abounader v Strohmeyer & Arpe Co.* (243 NY 458), the same court sustained the complaint of a grocer against a packer of olive oil whose containers were filled with less than the volume indicated on their labels in contravention of the Farms and Markets Law, a statute which it simultaneously determined to have been enacted for the benefit of the general public. The court stated (pp 465-466): "Holding then that this statute was passed for the benefit and protection of the general public and that it imposed upon one like the defendant a duty to the public and each member thereof, it is as we have already indicated well settled that such an one who has suffered from a disregard and violation of the duty has a cause of action for his damages against the one who has disregarded his duty. From the duty and its violation there is implied a cause of action in favor of the one for whose benefit the duty was imposed and who has been injured by its violation. No element of ordinary negligence is essential. Violation becomes actionable default." Moreover, the *Abounader* case has been cited with approval in the Note, "Private Damage Actions Against Public Sector Unions for Illegal Strikes" (91 Harv L Rev 1309, 1316-1317), which states: "It has been suggested * * * that where a law is enacted for the protection of all members of the public, rather than a particular subgroup thereof, the requirement of 'especial benefit' is not met, and no one individual may bring a civil action on the basis of the statute. Thus, courts have sometimes drawn a distinction between the rights of

the general public from which no private causes of action may be implied, and the rights accruing to individual members of the public. In many cases, however, those rights determined to benefit the general public are simply those in which the legislation was intended to benefit the municipality or all the members of the community in their corporate or group capacity. Thus, those laws which benefit members of the public in their individual capacities, which clearly include those relating to the provision of public services to individuals, may still give rise to a private cause of action. Furthermore, it can be argued that the class of intended beneficiaries must be determined with respect to the injury sought to be prevented. Securities statutes, for example, could also be said to be for the benefit of the entire public, since each member of the public may engage in the purchase or sale of securities. But courts have looked to those actually engaged in the protected activity in order to determine the class of intended beneficiaries. Similarly, legislation designed to prevent firefighters from striking is intended to protect those whose property may be on fire. Thus, antistrike laws can be said to be for the benefit of the entire public only in the sense that all members of the public are *potentially* within the class of those exposed to the danger sought to be prevented. Moreover, the size of the beneficiary class would not appear to be a factor in the determination of implied remedies. Private rights have been implied from legislation designed to benefit classes as large as all voters, all telephone users, and all consumers. *Finally, statutes explicitly found to have been intended for the benefit of the general public have been used as the basis for the implication of a private cause of action."* (Emphasis supplied in last sentence.) Accordingly, we believe that since the Taylor Law was enacted for the benefit of the general public, (1) the plaintiffs fall within the class of intended beneficiaries and (2) the mere fact of the statute's having been enacted for the benefit of the general public does not preclude the implication of a private right of action for its violation.

The second of the criteria set forth in *Cort v Ash* (422 US 66, *supra*) for determining whether a private cause of action may be deemed to exist is the presence or absence of

any legislative intent (express or implied) either to create a private remedy or to deny one. In this regard, while the parties have quoted extensively from the committee report and other legislative sources in an effort to persuade this court of their position, none of the quoted material indicates any intention either to create or deny a private remedy. Indeed, none of the quoted material indicates that the Legislature even considered the question. In fact, the only indication of legislative intent on this issue implicitly points toward the denial of a private right of action, for after the Supreme Court, New York County, dismissed a private cause of action brought after the 1966 transit strike for an alleged violation of the Condon-Wadlin Act (*Jamur Prods. Corp. v Quill,* 51 Misc 2d 501, 503-506), the Legislature failed to address the issue either in the successor statute (the Taylor Law) or in the subsequent amendments thereto.

Against this second criterion, and leaning ever so slightly toward the denial of a private right of action, must be balanced the third of the *Cort v Ash* criteria, i.e., whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy. It should be self-evident that the practice of allowing private rights of action would serve to further the "no-strike" policies of the act, but while the prevention of public employee strikes was an important objective of the Taylor Law, it was not its sole purpose. As articulated in section 200 of the Civil Service Law, another of its purposes was to "promote harmonious and cooperative relationships between government and its employees * * * by (a) granting to public employees the right of organization and representation". It should also be self-evident that permitting private damage suits will jeopardize the very existence of the public employee organizations encouraged by the Taylor Law just as effectively as it will deter the calling of strikes. Thus, the question boils down to which of these statutory objectives is the more important: the prevention of strikes or the preservation of the public employee bargaining apparatus. The Harvard case note (*supra*) discusses the pros and cons of allowing a private right of action from this perspective, and states (Note, Private Damage Actions Against Public

Sector Unions for Illegal Strikes, 91 Harv L Rev 1309, 1318-1320):

"Many of the more common insufficiencies of governmental enforcement are not present in the case of anti-strike laws. Courts have often implied a private damage action on the basis of a statute because violations might otherwise go undetected by an understaffed government agency. But the number of public sector strikes in each governmental unit is relatively small, and it is unlikely that such strikes will go undetected, since their very purpose is to cause widespread disruption. Thus, a private damage action will not aid enforcement of the law by facilitating the discovery of violations. Finally, government officials are likely to be the most knowledgeable about the causes and effects of these strikes.

"There are, however, special problems with government enforcement of antistrike legislation. First, injunctions are usually imposed just prior to or during the strike, when they may not only fail to overcome heightened union militancy, but in fact exacerbate it. Second, the magnitude of the usual sanctions may be insufficient to offset the benefits of striking which accrue to the union. Moreover, those public officials responsible for the imposition of sanctions are likely to waive the penalties provided for by the statute in order to achieve a quick settlement of a strike. The union therefore does not have to include the costs of the statutory sanctions in evaluating whether a strike should be called. In effect, the sanctions are the weapon of one of the parties of the contract, and therefore become the subject of bargaining. The governmental officials would be less likely to 'waive' privately recoverable damages by means of an indemnification agreement, since such indemnification would impose positive costs on the governmental unit.

*"Permitting a private damage action against a public sector union therefore imposes a cost on the union in addition to the specified sanctions, and thus would appear to be in furtherance of the goal of deterring public employee strikes. Once a strike in fact occurs, however, the existence of a private damage action could prolong the length of the strike, since the union is likely to include a demand for*

*indemnification among its conditions for settlement with the public employer.* As noted above, the public employer is unlikely to accede to such a demand, and it may be the very flexibility to overlook statutory sanctions that enables the government to achieve a speedy resolution of the strike. *Thus, it should be recognized that the cost of preventing some strikes by the implication of a private damage action may be the prolongation of those strikes that do occur.* [Emphasis Supplied.]

"If a certain balance of prestrike bargaining power was a consideration underlying the specified sanction, even if not the primary goal, the implication of a private damage action may have undesired consequences. It has been suggested that the implication of a damage action in favor of the public employer would upset the delicate balance of bargaining power struck by the legislature. This consideration would seem to apply equally well to private damage actions. But this view implies that the legislature intended that the possibility of public employee strikes play a role in the bargaining relationship, which seems unlikely in light of the explicit prohibition of such strikes.

"Courts have also expressed concern that the implication of a private damage action may place an unmanageable burden on the judiciary, creating 'a labor law logjam in [the] courts.' The implication doctrine provides no inherent means of limiting the cases. All intended beneficiaries of a service who suffer injury as a result of the disruption of the service by a public employee strike would be able to bring suit against the union under the implication doctrine. The requirement of special injury found in public nuisance law could be adopted as a limiting principle, and the general requirements of foreseeability and causation may provide further limitations, as in ordinary tort cases."

▮ In our recent decisions, this court appears to have regarded the strike prevention purpose of the Taylor Law as the more important. In *New York City Tr. Auth. v Lindner* (83 AD2d 573-574), for example, we stated: "Fulminations against the Taylor Law are fruitless. It constitutes the law of the State and must be obeyed. The State cannot step aside and allow the parties to pursue their own

selfish course. So long as the judiciary has contempt powers it must invoke them for the public good, and until such time as management and labor can co-exist in harmony and concord, those who inflict harm upon the public weal must understand that they must be prepared to suffer the consequences." However, the defendants properly point to another line of cases which is perhaps more directly in point, and which stands for the proposition that the more comprehensive the legislative scheme with regard to enforcement, the stronger is the presumption that a given further remedy was intentionally omitted (see *Middlesex County Sewerage Auth. v National Sea Clammers Assn.,* 453 US 1; *Northwest Airlines v Transport Workers Union of Amer., AFL-CIO,* 451 US 77, 93-94; see, also, *Drinkhouse v Parka Corp.,* 3 NY2d 82, 88; cf. *David v Fayman,* 273 App Div 408, affd 298 NY 669). We find this second line of cases persuasive.

The enforcement scheme prescribed by the Taylor Law is quite comprehensive, and includes, *inter alia,* the power to enjoin an illegal strike, to punish a union and its members for their willful violation of any such injunction, to deprive a striking union of its "dues check-off" privileges for an indefinite period of time, and to deduct from the compensation of every public employee who has been found to have violated its provisions "an amount equal to twice his daily rate of pay for each day or part thereof" that he has been found to have participated in an illegal strike (Civil Service Law, §§ 210, 211; see Judiciary Law, §§ 750, 751). It is this very complexity which militates against a determination that an additional remedy, i.e., a private cause of action, should be deemed to exist. So, too, does the failure of the Legislature to enact a provision specifically authorizing such an action following the decision in *Jamur Prods. Corp. v Quill* (51 Misc 2d 501, *supra*). Accordingly, we hold that the Taylor Law does not give rise to the existence of a private cause of action for damages arising out of an illegal public employee strike.[2]

---

**2.** On this analysis, we need not address the last of the *Cort v Ash* (422 US 66) criteria, i.e., whether the prospective cause of action is one which has traditionally been relegated to State law.

IV

Notwithstanding the foregoing, our holding here today that there is no private right of action for violations of the Taylor Law does not end our inquiry, for, as this court held in *Caso v District Council 37, Amer. Federation of State, County & Municipal Employees, AFL-CIO* (43 AD2d 159, *supra*), the existence of the Taylor Law does *not* preclude a private plaintiff from recovering damages incurred as a result of an illegal public employee strike *under traditional common-law precepts*. In the case now before us, however, neither of the plaintiffs have pleaded a single cause of action which would entitle them to monetary relief. We shall discuss each of the purported causes briefly.

A. Public Nuisance

The term "public nuisance" as employed in the law is not amenable to a precise definition, but has been variously described as follows:

"A public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency (Restatement, Torts, notes preceding § 822, p 217; see Penal Law, § 240.45). It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all (*New York Trap Rock Corp. v Town of Clarkston,* 299 NY 77, 80), in a manner such as to offend public morals, interfere with use * * * or injure the property, health, safety or comfort of a considerable number of persons (*Melker v City of New York,* 190 NY 481, 488; Restatement, Torts, notes preceding § 822, p 217)." (*Copart Inds. v Consolidated Edison Co. of N. Y.,* 41 NY2d 564, 568, mot for rearg den 42 NY2d 1102);

"(1) A public nuisance is an unreasonable interference with a right common to the general public.

"(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

"(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

"(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

"(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." (Restatement, Torts 2d, § 821B, p 87); and

"No better definition of a public nuisance has been suggested than that of an act or omission 'which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects.' The term comprehends a miscellaneous and diversified group of minor criminal offenses, based on some interference with the interests of the community, or the comfort or convenience of the general public." (Prosser, Torts [4th ed], § 88, p 583; see Prosser, Private Action for Public Nuisance, 52 Va L Rev 997, 999.) Fortunately, however, the sometimes difficult question of determining whether the existence of a public nuisance has been adequately pleaded is not an issue on these appeals for two reasons: first, because the various defendants have not challenged the sufficiency of the complaint in Action No. 1 on this ground, and second, because a public employee strike has already been held to fall within the ambit of the broad definition of a "public nuisance" (see *State of New York v Local 1115 Joint Bd., Nursing Home & Hosp. Employees Div.,* 56 AD2d 310, 318; *Caso v District Council 37, Amer. Federation of State, County & Municipal Employees, AFL-CIO,* 43 AD2d 159, 163, *supra;* cf. *Steelworkers v United States,* 361 US 39, 60-62 [FRANKFURTER and HARLAN, JJ., concurring]; Note, Private Damage Actions Against Public Sector Unions for Illegal Strikes, 91 Harv L Rev 1309, 1327-1332).

What the defendants do controvert, however, is the plaintiffs' right to recover damages in connection with a strike-related public nuisance, as the standard rule adopted by the courts of this State is that "In the absence of special damage to another, such public nuisance is subject only to correction at the hands of public authority. It is equally clear, however, that one who suffers damage or injury, beyond that of the general inconvenience to the

public at large, may recover for such nuisance in damages or obtain injunction to prevent its continuance. This is old law. (*Callanan v Gilman,* 107 NY 360; Prosser, Torts [2d ed.], p. 403 *et seq.*; 10 McQuillin, Municipal Corporations [3d ed.], § 30.128; 66 C.J.S., Nuisance, § 78.)" (*Graceland Corp. v Consolidated Laundries Corp.,* 7 AD2d 89, 91, affd 6 NY2d 900; see *Wakeman v Wilbur,* 147 NY 657, 663 [using the preferred term "peculiar injury"]; Restatement, Torts 2d, § 821C, subd [1].) Defendants maintain that the plaintiffs have failed to allege such peculiar injury for two reasons: first, because an allegation of pecuniary damage alone is insufficient and second, because here the entire community has suffered the same pecuniary damage. We shall consider the defendants' contentions seriatim.

To begin with, we believe that the New York cases support the plaintiffs' contention that an allegation of pecuniary damage can be sufficient to satisfy the "peculiar injury" test. In *Wakeman v Wilbur* (*supra,* p 664) for example, the injury was caused when the defendant obstructed a public road which it was necessary for the plaintiff to traverse. Accordingly, the plaintiff in *Wakeman,* like those in the case at bar was forced, *inter alia,* to employ other, more costly routes, all to his economic detriment. This species of pecuniary injury was adjudged sufficient by the court. In addition, Prosser cites other authorities who urge a similarly liberal view: "Jeremiah Smith, who was the pioneer in this area, as he was in so much else in the law of torts, contended in 1915 that any plaintiff who suffered substantial harm should have his action, since this in itself must set him apart from the general run of the public, to whom no actual harm, or at least no substantial harm, will result from the invasion of the public right. With this Professor Fleming has agreed. Both learned writers, however, have added the qualification that the substantial harm must be harm of a pecuniary nature." (Prosser, Private Action for Public Nuisance, 52 Va L Rev 997, 1008.) Prosser has further remarked, however (pp 1013-1016):

"The earliest recognition that pecuniary loss to the plaintiff might be particular damage, setting him apart from the general public, was in *Hart v. Bassett* in 1681.

Since then the principle has been undisputed, although its application has not always been unattended by difficulty.

"When the plaintiff is prevented from performing a specific contract, or is put to additional expense, or expensive delay in performing it, there is no doubt that he can always maintain his action, since the contract is clearly an individual matter, not common to the public. But even in the absence of such a definite obligation, pecuniary interests have received special protection.

"One group of cases has arisen where an established business made commercial use of the public right with which the defendant interfered. Thus when a river is blocked, a steamboat line operating boats upon it, or a company engaged in rafting logs or collecting tolls for passage, has been permitted almost without question to maintain the action. There are several cases in which commercial fisheries making a localized use of public waters have been allowed to recover where the ordinary citizen deprived of his occasional Sunday piscatorial pleasure could not do so. But even where the business is not itself founded upon the exercise of the public right, interference with a public right which causes harm to the business, as by blocking access to a shop which deprives it of customers, or interference with transportation which prevents a business establishment from obtaining materials or labor, or from shipping its goods to market, has been held to cause such particular damage that the action can be maintained.

"It must be repeated again that the business interference, and the type of pecuniary loss resulting from it, must be particular to the plaintiff, or to a *limited* group in which he is included. When it becomes so general and widespread as to affect a whole community, *or a very wide area within it,* the line is drawn. This has apparently been the explanation of occasional cases in which the remote obstruction of a distant highway, which caused the plaintiff expense in reaching a market, was held not to amount to particular damage. It might be noted in passing that the competition of an unlicensed business is not sufficient particular harm, not so much because it is common to the community as

because there is no individual right to be free from competition." (Emphasis supplied.)

However, the line between "general" and "peculiar" injury is not always clear. Thus, other courts have refused to recognize pecuniary loss as sufficient (see *Smedberg v Moxie Dam Co.,* 148 Me 302 [holding that a fishing camp owner could not recover for a dam owner's tampering with the lake's water level to the detriment of the fish population]), while one court, in a case involving an oil spill, has gone so far as to sustain the complaints of commercial fishermen and clam diggers, while dismissing those brought by businessmen dependent upon the tourist trade, on the ground that the former had a special interest in taking fish and clams from the water which was separate and distinct from that of the latter, whose injury was said to be no different in kind from that suffered by the general public (see *Burgess v M/V Tamano,* 370 F Supp 247, 250, affd 559 F2d 1200). In our view, the distinction urged by the *Burgess* court appears to be unwarranted.

■ Despite the dearth of authority on this point, at least one recent commentator has speculated: "In the case of public employee strikes, however, economic losses will be widespread, and it will be difficult to distinguish one economic loss from another as a difference in kind rather than in degree. Thus it would seem that economic losses which result from such situations as a transit strike do not constitute particular injury and are therefore not recoverable under the public nuisance doctrine." (Note, Private Damage Actions Against Public Sector Unions for Illegal Strikes, 91 Harv L Rev 1309, 1331.) Accordingly, although the cases do not preclude an allegation of pecuniary loss from satisfying the requirement of peculiar injury, we must still consider the defendants' alternate contention that the plaintiffs have failed to allege a peculiar injury because the type of losses which they allege were widely spread throughout the community. Here again, the reported cases provide no clear answer, for on the one side stands the principle that "the punishment of [a] wrong doer [in] a criminal prosecution will not compensate [the victim] for [his] individual injury; and [that] a party who has done a criminal act can not defend himself against a private suit

by alleging that he has injured many others in the same way, and that he will be ruined if he is compelled to make compensation to all" (*Lansing v Smith,* 4 Wend 9, 25; see *Wakeman v Wilbur,* 147 NY 657, 663, *supra*), while on the other stands the proposition that one who suffers a loss in common with the rest of the community may not bring a private cause of action to recover damages for a public nuisance (see Prosser, Private Action for Public Nuisance, 52 Va L Rev 997, 1010, 1015; Restatement, Torts 2d, § 821C, comment *h*). In the absence of any clear precedent, policy considerations may very well determine the outcome in a particular case, and here we have concluded that since the injury alleged has been suffered in common with virtually all other New York City businesses, the requisite finding of a peculiar injury simply cannot be made (see Prosser, Private Action for Public Nuisance, 52 Va L Rev 997, 1015). Accordingly, that cause of action predicated on public nuisance must be dismissed.

## B. Prima Facie Tort

■ Turning our attention to the causes of action for prima facie tort, we note that the Court of Appeals has recently set forth the key elements of that cause of action as follows: (1) the infliction of intentional harm, (2) resulting in damage, (3) without excuse or justification, (4) by an act or a series of acts which would otherwise be lawful (*ATI, Inc. v Ruder & Finn,* 42 NY2d 454, 458). Here, we need not evaluate the first three elements, as it is readily apparent that the plaintiffs cannot and did not allege that the strike in question was a *lawful* act. Moreover, their further contention that if prima facie tort envisions a *lawful* act, then it must a fortiori comprehend an *un*lawful act, is contrary to the cases, which state, *inter alia,* that the "lawful act" requirement may not be satisfied by an unlawful action (see *Sommer v Kaufman,* 59 AD2d 843, 844; *Effective Communications West v Board of Co-op. Educ. Servs. of Sole Supervisory Dist. of Cattaraugus, Erie & Wyoming Counties,* 57 AD2d 485, 490). Thus, as the First Department stated in *Ruza v Ruza* (286 App Div 767, 769-770): "Where, on the other hand, as appears from this complaint, reliance is apparently had only on specific unlawful and tortious acts, the remedy is not in prima facie

tort. Then the remedy, if any, is in what was characterized in the *Brandt* case as 'traditional tort' and characterized in the quotation in the *Advance Music* case as the 'categories of tort'. Thus, where specific torts account for all the damages sustained, whether provable as general damages or pleadable and provable as special damages, prima facie tort does not lie." Accordingly, these causes of action must likewise be dismissed.

## C. Interference with Business

█ Historically, the doctrine of interference with a business relationship was at one time limited to breaches of contract induced by tortious or unlawful activity (see *A. S. Rampell, Inc. v Hyster Co.,* 3 NY2d 369), and it was necessary to plead, *inter alia,* the breach of a contract (see *Inselman & Co. v FNB Fin. Co.,* 41 NY2d 1078) with actual knowledge on the part of the defendant of the contract's existence (see *A A Tube Testing Co. v Sohne,* 20 AD2d 639). More recently, however, the doctrine has been held to include, *inter alia,* the tortious interference with prospective contractual relations and voidable contracts (see *Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183), but even in its most liberal formulation, the relationships must be specified, as must the defendants' knowledge and the interference. Here, the plaintiff's allegations are totally conclusory and lacking in these elements. Accordingly, we believe that Special Term erred in refusing to dismiss the third cause of action in Action No. 2.

## D. Conspiracy

█ Focusing our attention on the fifth cause of action in Action No. 2, we agree with the TWU that there is no such independent tort as conspiracy recognized in this State. All that an allegation of conspiracy can accomplish is to connect nonactors, who might otherwise escape liability, with the acts of their coconspirators (see *Cuker Inds. v Crow Constr. Co.,* 6 AD2d 415, 417). Since there is no independent tort of conspiracy (see *Health Delivery Systems v Scheinman,* 42 AD2d 566, 567), Special Term erred in failing to dismiss this cause of action as well.

V

■ Plaintiff's cross appeal concerns the sixth cause of action in Action No. 2 (i.e., the cause of action for breach of contract) which was brought on the theory that the plaintiff therein, Jackson, Lewis, Schnitzler & Krupman, was a third-party beneficiary of the collective bargaining agreement between the TWU and its public employer. Plaintiff concedes that the collective bargaining agreement expired before the commencement of the strike, but argues nonetheless that the no-strike clause in the agreement continued in effect until a successor agreement could be entered into. In so doing, the plaintiff relies on the doctrine espoused in *Matter of Triborough Bridge & Tunnel Auth.* (5 PERB 3064); but in our view this reliance is misplaced. We construe the *Triborough* decision as precluding an employer from unilaterally changing the terms and conditions of employment during negotiations following the expiration of a collective bargaining agreement, but in no way do we view the decision therein or in *Matter of Board of Co-op. Educ. Servs. of Rockland County v New York State Public Employment Relations Bd.* (41 NY2d 753) as holding that *all* of the terms of a collective bargaining agreement will be carried over into the negotiation period following the expiration of such an agreement. Indeed, there appear to be exceptions to the *Triborough* doctrine even *within* the traditional "terms and conditions of employment", such as a provision for arbitration (see *Matter of Board of Educ. of City School Dist. of City of Poughkeepsie [Poughkeepsie Public School Teachers Assn.]*, 44 AD2d 598, 599). Moreover, the doctrine itself appears to be based more on labor law than on contract law for, as this court had occasion to state in *Matter of Corbin v County of Suffolk* (54 AD2d 698, 699): "The contracts having expired, the provisions for salary increments and longevity payments are no longer in effect * * * Hence, the county could not be required, after contract expiration, to honor those provisions, unless to avoid [an] improper employer practice [charge for] unilaterally * * * altering the *status quo* during negotiations for a new contract and thus not negotiating in good faith [but see *Matter of Board of Coop. Educ. Servs. of Rockland Co., supra*]. However, only PERB has

jurisdiction * * * to determine an improper practice charge". Therefore, in our view, the no-strike provision did not survive the expiration of the contract.

In addition, the parties appear to agree that whether the plaintiff at bar should be regarded as an intended beneficiary of the collective bargaining agreement in the first instance (and therefore entitled to sue for its breach) is controlled by the decision of this court in *Kornblut v Chevron Oil Co.* (62 AD2d 831, affd for the reasons stated in the opinion of Mr. Justice HOPKINS, 48 NY2d 853). In *Kornblut,* plaintiff's deceased, Fred Kornblut, sustained a flat tire on the New York State Thruway at approximately 3:00 P.M. on a hot afternoon in August of 1970. Shortly thereafter, the State Police notified the defendant, who had the exclusive service contract for that portion of the highway, of the Kornbluts' predicament, and informed Mr. Kornblut that help would arrive in about 20 minutes. Some time thereafter, another State trooper radioed the defendant and again told Mr. Kornblut that he could expect to receive help within 20 minutes. At 6:00 P.M., however, when no help had arrived, Kornblut proceeded to change the tire himself, thereby inducing the heart attack which took his life. The plaintiff's contention was (62 AD2d, at p 833): "that the decedent, as a user of the Thruway, was a third-party beneficiary of the contract between the Thruway Authority and Chevron, whereby Chevron was designated as the exclusive supplier of gasoline and services along the stretch of the Thruway where the decedent's automobile became disabled. The plaintiff argues that the defendants breached the contract by not rendering service to the decedent in accordance with the contract within 30 minutes from the time the call for assistance was made, and that the decedent's exertions occurred on account of the breach, from which the death and injuries proximately were the result."

This court (following the Restatement of Contracts) held, *inter alia,* that in order to recover on a third-party beneficiary theory for the breach of an agreement between the State and its contractor, it is necessary to establish either (1) an intention, manifested in the contract, as interpreted in light of the facts and circumstances surrounding its

execution, that the promisor shall compensate the members of the public, or (2) that the contract was entered into with a municipality for the rendition of services the non-performance of which would have subjected the municipality to liability for the damages incurred thereby (62 AD2d, at p 834). The case at bar, like *Kornblut,* involves the first of these criteria, which has also been phrased as follows: " 'In a broad sense it is true that every city contract, not improvident or wasteful, is for the benefit of the public. More than this, however, must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary (cf. *Fosmire v. Nat. Surety Co.,* 229 N. Y. 44). It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost.' " (*Kornblut v Chevron Oil Co., supra,* at p 835, quoting from *Moch Co. v Rensselaer Water Co.,* 247 NY 160, 164.) After examining the contract and finding an intention therein to benefit the decedent as a user of the Thruway, the court in *Kornblut* went on to note (62 AD2d, at pp 836-837):

"It is, however, another matter when a consequence, such as wrongful death, personal injury or property damage, not directly referred to in the contract, is the subject of the suit based on a breach of the contract * * *

"By choosing the theory of recovery based on contract, it became incumbent on the plaintiff to show that the injury was one which the defendants had reason to foresee as a probable result of the breach, under the ancient doctrine of *Hadley v Baxendale* (9 Exch R 341), and the cases following it (*Mortimer v Otto,* 206 NY 89; *Chapman v Fargo,* 223 NY 32), in distinction to the requirement of proximate cause in tort actions (*Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 346; cf. *Pagan v Goldberger,* 51 AD2d 508)."

At bar, as in *Kornblut,* there does not appear to be any intention expressed in the contract to pay consequential damages of the nature alleged in the respective complaints. Thus, while increased travel costs and certain lost profits could probably have been foreseen by the draftsmen as the result of an illegal strike, there is no indication from

within the four corners of the agreement that either party undertook to assume such liability. Therefore, even if we were to find that the no-strike clause was still in effect at the time of the instant strike, we believe that Special Term was correct in dismissing the third-party beneficiary breach of contract action.

Accordingly, the order appealed from should be modified, on the law, to the extent of granting the respective motions to dismiss the complaints in their entirety and, as so modified, affirmed, without costs or disbursements.

MOLLEN, P. J., WEINSTEIN and THOMPSON, JJ., concur.

Order of the Supreme Court, Queens County, dated April 17, 1981, modified, on the law, by deleting from the first decretal paragraph the word "denied" and substituting therefor the word "granted" and deleting from the second decretal paragraph everything after the word "granted". As so modified, order affirmed, without costs or disbursements.