**BALANCE POINT DIVORCE FUNDING, LLC, Plaintiff,**

v.

**Timothy D. SCRANTOM, Juridica Capital Management Limited, Juridica Capital Management (US) Inc., and Juridica Investments Limited, Defendants.**

**No. 13 Civ. 1049 PKC.**

United States District Court, S.D. New York.

Oct. 21, 2013.

As Corrected Oct. 31, 2013.

Andriy Roman Pazuniak, Judith Ann Lockhart, Carter Ledyard & Milburn, LLP, John Henry Doyle, III, Pablo Quinones, Reed Smith, New York, NY, for Plaintiff.

Alexander William Bogdan, Susan Millington Campbell, Hughes Hubbard & Reed LLP, New York, NY, Robert Dean MacGill, Scott Elwin Murray, Barnes & Thornburg, Indianapolis, IN, Wayne Charles Kreuscher, Goldberg Segalla LLP, White Plains, NY, for Defendants.

### MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

Private entities, like Balance Point Divorce Funding, LLC ("Balance Point"), lend money to parties to a divorce proceeding to cover fees and expenses in exchange for an obligation to repay when the matter is resolved. Timothy D. Scrantom and Lila Masters, then married, were parties to a divorce proceeding in Montana in which Balance Point provided funding to Ms. Masters. As it happens, Mr. Scrantom had an affiliation, or so it is alleged, with a competing funding company and its affiliates, defendants Juridica Capital Management Limited, Juridica Capital Management (US) Inc., and Juridica Investments Limited (collectively, "Juridica").

These facts are at the core of claims and counterclaims between Balance Point and Ms. Masters in a federal action in Montana, *Balance Point Divorce Funding, LLC v. Masters,* No. CV–12–40–BU–SEH (D.Mont.). They—and the existence of this action—are also at the heart of a suit by Mr. Scrantom against Balance Point in state court in Montana. *Scrantom v. Waterman,* No. DV–13–327A (Mont. 18th Jud. Dist. Ct., Gallatin Cnty.).

The action before this Court is brought by Balance Point against Mr. Scrantom and the Juridica companies asserting claims of tortious interference with contract, tortious interference with business relations, and misappropriation of trade secrets. Juridica moves to dismiss Balance Point's Second Amended Complaint (the "SAC"), pursuant to Rule 12(b)(6), Fed.R.Civ.P. (Docket # 34.) Mr. Scrantom moves to dismiss the SAC, also pursuant to Rule 12(b)(6), and, in the alternative to dismiss the claims against him under principles of abstention, or to transfer any remaining claims to the United States District Court for the District of Montana under 28 U.S.C. § 1404(a). (Docket # 31.)

For the reasons stated below, defendants' motions to dismiss are granted with respect to the tortious interference with business relations claim and denied with respect to all other claims. Mr. Scrantom's motion to dismiss under principles of abstention is denied, and his motion to transfer venue is denied without prejudice.

### BACKGROUND

The following facts are taken from the SAC, and documents relied upon therein, and are assumed to be true for the pur-

pose of deciding defendants' motions to dismiss. All reasonable inferences are drawn in favor of the plaintiff, *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir.2007) (per curiam).

Plaintiff Balance Point is a limited liability company that provides litigation funding and support to parties in divorce proceedings. (SAC ¶¶ 2, 13.) In or around May, 2011, Lila Masters contacted Balance Point in order to obtain financing to cover legal fees and expenses she would incur in connection with her divorce from defendant Mr. Scrantom. (*Id.* ¶¶ 1, 3, 17.) In exchange for providing financing to cover the costs of a deposition, Ms. Masters agreed to assign Balance Point a 5% interest in her marital asset claims. (*Id.* ¶ 18.) The following September, Masters and Balance Point amended their agreement. (*See id.*) Under the terms of the amended agreement, Balance Point, in exchange for funding up to $310,435 of the costs of the divorce proceedings, would receive a 25% interest in Ms. Masters's claims and any settlement would be paid to her divorce attorneys. (*Id.*) In addition, Ms. Masters signed confidentiality agreements in which she, and her divorce attorneys, agreed not to disclose the terms and conditions of any agreement she had with Balance Point. (*Id.*) Balance Point considered the contents of its purchase agreements, which included its funding strategies, to be trade secrets. (*Id.* ¶¶ 47, 71) Pursuant to the agreements, Balance Point provided Ms. Masters with more than $310,435 to finance her divorce proceedings. (*Id.* ¶ 19.)

Mr. Scrantom is an actively licensed attorney and a prominent figure in the litigation funding· industry, having co-founded three litigation funding companies, including defendant Juridica. (*Id.* ¶¶ 8, 14.) At the time of the divorce proceedings, Mr. Scrantom owned equity in Juridica and served as its "strategic consultant." (*Id.*

¶¶ 3, 15.) In this role, he exerted control over Juridica, influenced its day-to-day operations and long-term business strategies, and, "at all relevant times," represented to others that he was authorized to act on Juridica's behalf. (*Id.* ¶ 15) Balance Point alleges that Mr. Scrantom considered Balance Point to be one of Juridica's competitors. (*Id.* ¶¶ 22–23.)

In October, 2011, after learning that Ms. Masters had entered into a funding agreement with Balance Point, Mr. Scrantom stated that, because Balance Point was a competitor, its involvement in the divorce proceedings was improper since any settlement with Ms. Masters would include stock and other rights related to Juridica. (*Id.* ¶¶ 22–23.) Mr. Scranton repeatedly told Ms. Masters and Balance Point that, if Balance Point continued to fund Ms. Masters, Juridica would initiate litigation against Balance Point. (*See id.* ¶ 22.) Mr. Scrantom made many of the litigation threats using an email account affiliated with BlackRobe Capital Partners LLC ("BlackRobe"), a third-party litigation funding company based in New York City, and provided a New York City address in his email signature block. (*Id.* ¶¶ 16, 22.) In addition to sending E-mails, Mr. Scrantom personally told Ms. Masters on December 8, 2011, during an encounter at LaGuardia Airport in New York, that Juridica would sue Balance Point unless Ms. Masters instructed her divorce attorneys to negotiate a settlement with Mr. Scrantom's divorce attorney. (*Id.* ¶ 26.)

In April, 2012, Mr. Scranton and Ms. Masters began directly negotiating a divorce settlement without involvement from either Balance Point, or Ms. Masters's attorneys. (*See id.* ¶ 38.) Under the terms of the settlement reached on April 18, 2012, Ms. Masters was to receive marital property worth at least $4,310,000, half of Mr. Scrantom's residual interests in Juri-

dica case investments, and 102,091 shares of Juridica Capital Management Limited stock. (*Id.*)

After entering into the settlement, Mr. Scrantom began telling Ms. Masters that Balance Point was not acting in her interests and encouraged her to consider suing. (*Id.* ¶¶ 36, 42.) In May 2012, Mr. Scrantom attempted to hire an attorney to render a legal opinion to Masters that her agreement with Balance Point was not enforceable. (*Id.* ¶ 41.) Later, in May and June 2012, Mr. Scrantom, using his Black-Robe email account, sent Ms. Masters messages asking whether her attorney would "have a problem" suing and whether her attorney was "on board to start sending letters." (*Id.* ¶ 36.)

Under the terms of Ms. Masters's agreement with Balance Point, Ms. Masters was obligated to pay Balance Point a minimum of $1,077,750, exclusive of interest, representing 25% of the marital property that she would receive in the settlement. (*Id.* ¶ 40.) Balance Point alleges that Mr. Scrantom convinced Masters that she would receive a more favorable divorce settlement if she breached her contracts with both Balance Point and her divorce attorneys. (*Id.* ¶ 37.)

Subsequently, Ms. Masters breached her agreements with Balance Point. (*Id.* ¶¶ 43–45, 48.) In June, 2012, Ms. Masters refused to pay Balance Point any amount of money that she owed and allowed Mr. Scrantom to send her payments directly, rather than having him send them to her attorney, which her agreements with Balance Point required. (*Id.* ¶¶ 44, 48–49.) Ms. Masters also sent copies of her agreements to Mr. Scrantom at his New York location, in violation of her confidentiality agreements. (*Id.* ¶ 45.) Consequently, Balance Point commenced litigation against Ms. Masters in the District of Montana. (*Id.* ¶ 44.)

At the time of Mr. Scrantom's initial litigation threats, Balance Point was involved in negotiations with Asta Funding, Inc. ("Asta") to receive an infusion of capital. (*Id.* ¶ 28.) In order to secure capital, Balance Point was required to disclose any threats of litigation to prospective investors or equity funding partners, which it did. (*See id.*) Balance Point alleges that, due to his involvement in the litigation funding field, Mr. Scrantom knew that Balance Point would be in frequent negotiations with prospective investors and that his threats of litigation on Juridica's behalf would hurt Balance Point's ability to obtain favorable funding terms. (*Id.* ¶¶ 28, 35, 61.) Prior to Balance Point disclosing the litigation threats, Asta and Balance Point were close to finalizing an arrangement in which Asta would provide a $50 million line of credit and $1.5 million in operating capital. (*Id.* ¶ 30.) Closing was set to take place in December, 2011. (*Id.* ¶ 31.)

After Balance Point disclosed the threatened litigation, Asta declined to close and began renegotiating with Balance Point. (*Id.*) Due in large part to the litigation threats, Asta altered the proposal and offered less favorable financing terms; Asta only offered Balance Point $1 million in operating capital and the ability to draw on $5 million tranches, and only if certain contingencies were met. (*See id.* ¶¶ 30–32.) The revised deal closed in May, 2012, and cost Balance Point $95,000 in additional legal fees. (*Id.* ¶ 34–35.) When Balance Point and Asta publically announced the deal, Ms. Masters sent Mr. Scrantom an email containing a press release announcing the agreement with Asta and stating that "any threat from you didn't stop [Balance Point] from entering into [the agreement]." (*Id.* ¶ 35.)

In April, 2013, during the renegotiation period, Balance Point's counsel sent two

letters to Juridica notifying them that Mr. Scrantom, acting on Juridica's behalf, repeatedly threatened to bring suit against Balance Point. (*Id.* ¶ 32.) In addition to detailing Mr. Scrantom's communications with Balance Point, Balance Point stated in the letter that Mr. Scrantom's actions had an effect on a "major transaction for which Balance Point has been negotiating." (Def's Mem. of Law in Supp. of Mot. to Dismiss, Ex. A, at 2.) Juridica did not respond to either letter or offer assurances that it did not intend to sue Balance Point. (*Id.*) Juridica did, however, notify Mr. Scrantom of the letters, which he forwarded to Ms. Masters on May 11, 2012. (*See id.* ¶ 33.) Based on Juridica's silence, both Asta and Balance Point believed that Juridica authorized Mr. Scrantom to threaten litigation on its behalf. (*Id.* ¶ 32.)

Balance Point alleges that Juridica and Mr. Scrantom caused Ms. Masters to breach her contract with Balance Point by threatening litigation, convincing Ms. Masters that her funding agreement was not enforceable, convincing Ms. Masters that Balance Point was not acting in her best interests, persuading her to disclose her confidential agreements with Balance Point, and making settlement payments directly to her, rather than her divorce attorneys. (*Id.* ¶ 55.) Balance Point further alleges that Juridica and Mr. Scrantom brought litigation threats in order to harm Balance Point's ability to obtain equity funding from Asta upon favorable terms. (*Id.* ¶¶ 63–64.) Balance Point also alleges that Mr. Scrantom improperly induced Ms. Masters to breach her confidentiality agreements with Balance Point, and thereby misappropriated its trade secrets. (*Id.* ¶ 69–71.)

Balance Point is a limited liability company organized under the laws of Nevada whose sole member is a citizen of California. (*Id.* ¶ 2). Mr. Scrantom is citizen of South Carolina. (*Id.* ¶ 3). Juridica Capital Management Limited is a corporation organized under the laws of Guernsey and maintains its principal place of business in Guernsey. (*Id.* ¶ 4.) Juridica Capital Management (US) Inc. is a corporation incorporated in Delaware and maintains its principal place of business in New York. (*Id.* ¶ 5.) Juridica Investments Limited is a closed-end investment company organized under the laws of Guernsey and maintains its principal place of business in Guernsey. (*Id.* ¶ 6.) Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332(a).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain ... sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant. *See Elevator Antitrust Litig.,* 502 F.3d at 50. Legal conclusions, however, are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679, 129 S.Ct. 1937.

"[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62

F.3d 69, 72 (2d Cir.1995) (per curiam)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir.2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers*, 282 F.3d at 152–53)). "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers*, 282 F.3d at 153. "[E]ven if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *DiFolco*, 622 F.3d at 111 (internal quotation marks and citation omitted).

### CHOICE OF LAW

The parties both present arguments based on New York law, the law of the forum state. Accordingly, the Court will apply New York law. *See, e.g., Tehran–Berkeley Civil and Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989) ("consent to use a forum's law is sufficient to establish choice of law").

### DISCUSSION

I. *Defendants' Motion to Dismiss is Denied with Respect to Defendants' Tortious Interference with Contract Claims.*

Balance Point's tortious interference with contract claim against Mr. Scrantom stems from his alleged actions in persuading Ms. Masters to breach her agreements with Balance Point. Mr. Scrantom moves to dismiss on the grounds that, since Mr.

Scrantom acted in his own economic interest, Balance Point was required to allege that Mr. Scrantom's actions rose to the level of fraud or illegality and did not do so. Mr. Scrantom also moves to dismiss on the grounds that the pleadings do not show that his actions were the "but for" cause of Ms. Masters's breach and that, since Balance Point's sole member is an attorney, Ms. Master's agreement with Balance Point is invalid because attorneys may not lawfully enter into contingent-fee arrangements concerning divorce proceedings.

■ Balance Point's tortious interference with contract claim against Juridica is premised upon the allegation that statements by Mr. Scrantom to his soon-to-be ex-wife, Ms. Masters, caused her to breach her agreement with Balance Point and that Juridica authorized his actions. Juridica moves to dismiss on the grounds that Mr. Scrantom did not have authority to act on Juridica's behalf, and that Balance Point has failed to allege that but for his actions, Ms. Masters would not have breached her contract with Balance Point.

■ In order to maintain a cause of action for tortious interference with contract under New York law, a plaintiff must allege (1) the existence of a valid contract between plaintiff and a third party, (2) that defendant knew of the contract, (3) that defendant intentionally caused the third party to breach, or render the contract impossible, and (4) damages to plaintiff. *Int'l Minerals & Resources, S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir.1996) (citations omitted). In addition, in order to show causation, plaintiff must specifically allege that there would not have been a breach but for the actions of defendants. *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir.1990); *Ferrandino & Son, Inc. v. Wheaton Builders, Inc.*, 82

A.D.3d 1035, 1036, 920 N.Y.S.2d 123 (2d Dep't 2011); *see also Mina Inv. Holdings Ltd. v. Lefkowitz*, 184 F.R.D. 245, 250–256 (S.D.N.Y.1999) (affirming the "but for" pleading requirement in light of subsequent precedent).

■ With respect to Mr. Scrantom, the complaint properly states a claim for tortious interference with contract. First, the complaint states that there was a contract between Balance Point and Ms. Masters. (*Id.* ¶¶ 18, 51.) Second, the complaint alleges that Mr. Scrantom knew about the contract. (*Id.* ¶¶ 22, 54.) Third, Balance Point alleges that Mr. Scrantom intentionally caused Ms. Masters to breach the contract. (*Id.* ¶¶ 26, 36, 38, 41–42, 55.) Finally, Balance Point alleges damages. (*Id.* ¶¶ 44, 56.)

■ Balance Point also plausibly alleges that Mr. Scrantom was a "but for" cause of Ms. Masters's breach. The complaint alleges that Ms. Masters's breach was directly caused by Mr. Scrantom's actions in threatening litigation, persuading Ms. Masters that her funding agreement with Balance Point was not enforceable, convincing Ms. Masters that Balance Point was not working in her best interests, persuading Ms. Masters to disclose her confidential agreements with Balance Point to Mr. Scrantom, and making divorce settlement payments to Ms. Masters directly. (*Id.* ¶ 55.) The actions alleged plausibly give rise to the inference that, had Mr. Scrantom not acted, Ms. Masters would not have breached her contract with Balance Point.

■ Mr. Scrantom's assertions of economic interest and invalidity of the underlying contract are affirmative defenses to a claim of tortious interference with contract. *See Int'l Minerals & Resources, S.A.*, 96 F.3d at 595 (citations omitted); *Foster v. Churchill*, 87 N.Y.2d 744, 750–51,

642 N.Y.S.2d 583, 665 N.E.2d 153 (1996). In general, affirmative defenses require consideration of facts outside of the complaint and are inappropriate to consider on a motion to dismiss, unless "the facts necessary to establish the defense are evident on the face of the complaint." *Kelly–Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir.2013).

Here, the complaint does not contain facts sufficient to sustain a defense of invalidity. Balance Point details the contours of its agreements with Ms. Masters in connection with her divorce proceedings and does not provide any more details. (*See* SAC ¶ 18.) There is also no reference to the profession of Balance Point's member; Balance Point, a limited liability company, describes its member as a resident of California, but alleges nothing about her status as an admitted attorney. (*Id.* ¶ 2.) This is a threshold premise to consideration of any invalidity defense. Accordingly, I cannot conclude that a defense of invalidity appears on the face of the complaint.

Similarly, I cannot conclude that a defense of economic justification appears on the face of the complaint. Though the complaint alleges that Mr. Scrantom acted in his economic interest in settling with Ms. Masters, the complaint also alleges that Mr. Scrantom was motivated by a desire to prevent Balance Point from gaining shares of Juridica stock. (*Id.* ¶¶ 22, 37.) Because the complaint alleges an alternative motivation for Mr. Scrantom's actions, it is inappropriate to consider a defense of economic justification at this time.

■ With respect to Juridica, Balance Point's claim is solely based on vicarious liability for Mr. Scrantom's actions; Mr. Scrantom served as its "strategic consultant," represented himself to Balance Point as Juridica's employee, and had been

one of its founders. (*See Id.* ¶¶ 14–15, 32.) It is a fundamental principal of agency that the acts of an agent, acting within the scope of its authority, are imputed to the principal. *Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 465, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010). Conversely, actions outside the scope of an agent's authority are not imputed to the principal. *See id.* Balance Point alleges that, "at all relevant times," Mr. Scrantom represented himself as having authorization to act on Juridica's behalf. (*See* SAC ¶ 15.)

It is plausible that Mr. Scrantom was acting on behalf of Juridica when he allegedly interfered with Ms. Masters's contract with Balance Point. According to the complaint, Mr. Scrantom was concerned that, as a consequence of a settlement, Balance Point, which he viewed as a direct competitor to Juridica, would obtain stock as part of a settlement and thereby harm Juridica's business. (*Id.* ¶ 22–23.) Arguably, actions by Mr. Scrantom would be in furtherance of Juridica's interest. Because Mr. Scrantom held himself out as Juridica's employee at the time, the inference may be drawn that he was acting as Juridica's agent at the time of his actions and acting within the scope of his authority. Therefore, Balance Point plausibly alleges that Juridica is liable for Mr. Scrantom's actions and states a claim against Juridica for tortious interference with contract.

II. *Plaintiff's Tortious Interference with Business Relations Is Dismissed for Failure to State a Claim as to All Defendants.*

Balance Point's tortious interference with business relations claim is premised upon the allegation that statements made by Mr, Scrantom to both Balance Point and Ms. Masters were made in order to harm Juridica's funding prospects with third-party investors generally, and Asta specifically. Juridica moves to dismiss on the grounds that Mr. Scrantom did not have authority to act on Juridica's behalf in making the statements. Both Juridica and Mr. Scrantom also move to dismiss the claim on the grounds that Balance Point has failed to allege that the threats of suit against Balance Point were directed towards Asta. Mr. Scrantom further argues that the claim fails to allege that he knew about Balance Point's negotiations with Asta.

To bring a claim of tortious interference with business relations, a plaintiff must allege that (1) there is a business relationship between the plaintiff and a third party, (2) the defendant, knowing of the relationship, intentionally interfered with it, (3) the defendant acted with the sole purpose of harming the plaintiff, or used dishonest, unfair, or improper means, and (4) the relationship was injured. *Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108–09 (2d Cir.1997) (applying New York law). The allegation that the defendant had actual knowledge of the relationship in issue is an essential element of the claim. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 88 A.D.2d 50, 72, 452 N.Y.S.2d 80 (2d Dep't 1982); *A A Tube Testing Co. v. Sohne,* 20 A.D.2d 639, 639, 246 N.Y.S.2d 247 (2d Dep't 1964). Consequently, a plaintiff must specify the business relationship harmed by the defendant's actions. *Lindner,* 88 A.D.2d at 72, 452 N.Y.S.2d 80; *see Havana Central NY2 LLC v. Lunney's Pub, Inc.,* 49 A.D.3d 70, 74, 852 N.Y.S.2d 32 (1st Dep't 2007).

Therefore, in order to withstand a motion to dismiss, the complaint must allege both that the defendant interfered with a specific relationship, and that the defendant knew about the relationship at the time of the alleged interference. *See Sedona Corp. v. Ladenburg Thalmann*

& Co., No. 03 Civ. 3120(LTS)(THK) 2009 WL 1492196, at *9 (S.D.N.Y. May 27, 2009); AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., No. 02 Civ. 1363(PKL), 2003 WL 21203503, at *6 (S.D.N.Y. May 22, 2003). Mere allegations that a defendant knew of plaintiff's general business model are not sufficient to establish a defendant's knowledge of a specific business relationship. Sedona Corp., 2009 WL 1492196, at *9.

 Here, Balance Point alleges a specific business relationship harmed by Mr. Scrantom's actions, namely its funding negotiations with Asta. (SAC ¶ 30.) The complaint does not, however, plausibly allege that Mr. Scrantom knew Balance Point was in negotiations with Asta at the time he threatened litigation. In its complaint, Balance Point alleges that Mr. Scrantom, by virtue of his status in the litigation funding field, knew that Balance Point would be in frequent negotiations with "prospective investors." (Id. ¶ 61.) Balance Point further alleges that Mr. Scrantom "knew that a lawsuit by Juridica would cause Balance Point significant problems with funding from investors" and disclosing the threat of litigation would "hurt Balance Point's ability to obtain favorable funding terms." (Id. ¶ 27–28.)

The complaint plausibly alleges that Mr. Scrantom was aware of Balance Point's business model and that, from time to time, it would seek investor or equity funding partners. The complaint implies, however, that there are a number of companies that act as investors in the litigation funding field and that Asta is just one among them. (See id. ¶ 61.) Nowhere is it alleged that Mr. Scrantom, or Juridica, knew that Balance Point was in active discussions with anyone, including Asta when he made the alleged threats of litigation in December, 2011.

Balance Point asserts that, in its April 13, 2012, letter to Juridica, Balance Point "expressly advised Juridica that it 'has been' negotiating a financing deal with Asta...." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss, 12.) The letter, which is referred to in the complaint and properly considered on a motion to dismiss, does not mention Asta by name. Rather, Balance Point's letter claims that Mr. Scrantom's actions had an effect on a "major transaction for which Balance Point [had] been negotiating." (Def's Mem. of Law in Supp. of Mot. to Dismiss, Ex. A, at 2); see DiFolco, 622 F.3d at 111; Chambers, 282 F.3d at 152–53. Balance Point further asserts that Ms. Masters, in forwarding the press release announcing Balance Point's deal with Asta to Mr. Scrantom, indicated that Mr. Scrantom was aware that Balance Point was negotiating an equity funding arrangement with Asta. (Id. ¶ 35.)

Neither the letter, nor the email, however, shows that Mr. Scrantom was aware of the funding arrangement at the time of his alleged threats of litigation. The email containing the press release could not have been sent before May, 2012, since the press release was only issued after the deal closed. (See id.) However, Mr, Scrantom's alleged threats of litigation took place in December, 2011, four months before Balance Point's letter to Juridica. (Id. ¶ 25.) Since both Balance Point's letter and Ms. Masters's email were sent after the time of Mr. Scrantom's statements, the inference may not be drawn that Mr. Scrantom specifically knew of Balance Point's negotiations with Asta at the time of his alleged interference.

Because the complaint fails to allege that Mr. Scrantom was aware of Balance Point's relationship with Asta when he threatened litigation, Balance Point's claim for tortious interference with a prospective

business relationship claim is dismissed against both Juridica and Mr. Scrantom. Accordingly, I need not reach defendants' other arguments.

III. *Defendant Scrantom's Motion to Dismiss is Denied with Respect to Plaintiff's Misappropriation of Trade Secrets Claim.*

Balance Point alleges that, since its purchase agreements constituted trade secrets, when Mr. Scrantom allegedly induced Ms. Master to provide him with copies, against her confidentiality agreements, his actions constituted procurement of trade secrets through improper means. Mr. Scrantom asserts that the claim is deficient because it neither alleges that he used Balance Point's trade secrets, nor that he employed improper means in obtaining them.

 Under New York law, to succeed in a claim of misappropriation of trade secrets, a plaintiff must show that (1) it possessed a trade secret, and (2) the defendant used, or is using, the trade secret "in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990); *see Spectron Glass & Elecs., Inc. v. Marianovsky,* 273 A.D.2d 374, 374, 710 N.Y.S.2d 916 (2d Dep't 2000).

 Here, Mr. Scrantom does not challenge that Balance Point has alleged that agreements, such as the one between Balance Point and Ms. Masters constitute trade secrets, and admits that he did obtain a copy of it. (*See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss and Mot. to Transfer the Second Am. Compl., 24.) Mr. Scrantom asserts, however, that mere possession of a trade secret is not sufficient to establish that he used the trade secret in any way. A claim of misappropriation is "rooted in the improper use of trade secrets to gain an advantage over plaintiff." *CBS Corp. v. Dumsday,* 268 A.D.2d 350, 353, 702 N.Y.S.2d 248 (1st Dep't 2000). Consequently, a plaintiff must plead facts sufficient to raise an inference that a defendant improperly used a trade secret, but need not specifically plead that the defendant used the trade secrets. *See id.*

Balance Point's pleadings give rise to a plausible inference that Mr. Scrantom used the purchase agreements to gain an advantage over it in competition. At the time Ms. Masters sent Mr. Scrantom copies of the purchase agreements, Mr. Scrantom was Juridica's "strategic consultant" and exercised control over Juridica's operations and business strategies. (*See* SAC ¶ 15.) While in this role, he viewed Balance Point as a competitor. (*Id.* ¶ 23.) A reasonable inference from the pleading is that knowledge of the contents of the template of the Balance Point agreement would enable Juridica inevitably to better compete with Balance Point. If Mr. Scrantom took any action in his management of Juridica in response to what he saw, it would constitute use of the agreement to gain an advantage over Balance Point.

Mr. Scrantom also asserts that "improperly induc[ing]" Ms. Masters does not constitute improper means in obtaining confidential information. There is no case law explicitly defining "improper means" under New York law. New York courts have, however, looked to the Restatement of Torts in defining the various elements of the cause of action. *See Integrated Cash Mgmt. Servs., Inc.,* 920 F.2d at 173 (citing the Restatement for the elements of the claim under New York law); *Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) (adopting the Restatement definition of a trade secret). Accordingly, the Restate-

ment is an appropriate source of guidance here. According to the Restatement, "improper means" are generally "means which fall below the generally accepted standards of commercial morality and reasonable conduct." Restatement of Torts § 757 cmt. f (1939).

Here, Mr. Scrantom's alleged behavior falls below the "generally accepted" standards of "reasonable conduct." Balance Point's complaint implies that it was industry practice that purchase agreements in the litigation funding industry were confidential. (See SAC ¶ 46.) Balance Point alleges that Mr. Scrantom, having worked in the industry for a number of years would have been aware of this. (See id.) Furthermore, Balance Point has alleged that Mr. Scrantom's actions were tortious. (See id. ¶¶ 55, 71.) These allegations plausibly give rise to the inference that by seeking out information that he knew to be confidential, Mr. Scrantom's actions fall below the standard of reasonable conduct in the litigation funding industry. Therefore, the complaint plausibly alleges that Mr. Scrantom used improper means in obtaining Balance Point's purchase agreements.

Because the complaint plausibly alleges that Mr. Scrantom used the information in Balance Point's purchase agreements and that he obtained the purchase agreements through improper means, the complaint states a claim for misappropriation of trade secrets.

IV. *Defendant Scrantom's Motion to Dismiss the Claims Under Principles of Abstention Is Denied.*

■■■■ Due to the pending actions in federal and state court in Montana, Mr. Scrantom moves to have the claims against him dismissed under principles of abstention. In general, federal courts have a "virtually unflagging obligation of the fed-

eral courts to exercise the jurisdiction given them," though when there is parallel litigation in both state and federal court, abstention may be appropriate in limited, "exceptional" circumstances. *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 818–19, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Thus abstention under *Colorado River* only applies in cases where parallel actions take place in state and federal court. *Vill. of Westfield v. Welch's,* 170 F.3d 116, 120 (2d Cir.1999).

■■■■ Before undertaking a full analysis, a necessary threshold condition is a determination as to whether the state and federal actions are truly parallel. *Dittmer v. Cnty. of Suffolk,* 146 F.3d 113, 118 (2d Cir.1998). "Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." *Id.* (quoting *Day v. Union Mines, Inc.,* 862 F.2d 652, 655 (7th Cir.1988)).

■■■■ Here, there is one contemporary action pending in state court in Montana, Mr. Scrantom's suit against Balance Point. (Bogdan Affirm. Ex. S.) The Montana action is not, however, parallel to the current case. In Montana, Mr. Scrantom brought a claim against Balance Point for abuse of process. (*Id.* at 43.) As part of the claim, Mr. Scrantom alleged that Balance Point's claims in this Court are in furtherance of unlawful purposes. (*Id.* at 46.) Balance Point's motivation for bringing suit, however, is not at issue here. The issues in this Court are whether Mr. Scrantom improperly induced Ms. Masters to breach her agreements with Balance Point and whether Juridica may be held liable for Mr. Scrantom's actions. These issues will not be decided in the Montana litigation. The Montana court will, however, in making its final determination, look to the outcome of the litigation in this Court, as well as the record developed, in

determining Balance Point's motives for bringing suit. Though the two actions are related, they are not parallel as they do not concern "substantially the same issue." Therefore, abstention under *Colorado River* is not appropriate and Mr. Scrantom's motion is denied.

V. *Defendant Scrantom's Motion to Transfer to the United States District Court for the District of Montana Is Denied Without Prejudice.*

Based, in large part, on the ongoing litigation between Balance Point and Ms. Masters in the District of Montana, Mr. Scrantom seeks to transfer the action to the District of Montana under 28 U.S.C. § 1404(a).

 Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Thus, "[d]eciding a § 1404(a) motion to transfer venue 'requires a two-part inquiry: first, whether the action to be transferred might have been brought in the transferee court; and second, whether considering the convenience of the parties and witnesses, and the interest of justice, a transfer is appropriate.'" *AGCS Marine Ins. Co. v. Associated Gas & Oil Co., Ltd.,* 775 F.Supp.2d 640, 645 (S.D.N.Y.2011) (quoting *Fuji Photo Film Co., Ltd. v. Lexar Media Inc.,* 415 F.Supp.2d 370, 373 (S.D.N.Y.2006)). The burden of demonstrating the desirability of transfer lies with the moving party, who must "make a clear and convincing showing that the balance of convenience favors defendants' choice." *Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y.1995). Determinations of convenience under section 1404(a) are made on a case-by-case basis and are within the broad discretion of district courts. *D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 106 (2d Cir.2006).

 An action "might have been brought" in another forum if venue would have been proper there and the defendants would have been amenable to personal jurisdiction in the transferee forum when the action was initiated. *See Hoffman v. Blaski,* 363 U.S. 335, 344, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960). If transfer is not appropriate with respect to all defendants, the action may be severed as to claims against one or more defendants for the purpose of permitting the transfer of the action against the other defendants. *Wyndham Assocs. v. Bintliff,* 398 F.2d 614, 618–19 (2d Cir.1968). This procedure is only appropriate, however, when the administration of justice would be materially advanced by severance and transfer, "at least in cases where . . . the defendants as to whom venue would not be proper in the transferee district are alleged to be only indirectly connected to the manipulations which form the main subject matter of the action." *Id.*

As the moving party, Mr. Scrantom has the burden of showing that the District of Montana would be a suitable forum for the litigation. As a threshold matter, Mr. Scrantom has not shown that the action might have been brought against all parties in Montana. He requests, rather, that this Court sever the action against him and transfer the claims against him while retaining jurisdiction over the claims against Juridica. (Mem. of Law in Supp. of Def.'s Mot. to Dismiss and Mot. to Transfer the Second Am. Compl., 13.)

 It cannot be said that the claims against Juridica are only "indirectly connected" to the main subject matter of the action. Because Balance Point alleges

that Mr. Scrantom acted as Juridica's agent, the claims against Juridica come from identical facts and circumstances as those against Mr. Scrantom and are thus directly connected to the claims against him. Severing the action, therefore, would not advance the interest of justice. Rather, severing the action would cause two parallel actions to be created, each with the same facts, witnesses, and defenses. Each issue in the claims would be litigated twice, reducing efficiency and creating a risk of inconsistent results. Therefore, I decline to sever the action against Juridica from the action against Mr. Scrantom. Because Mr. Scrantom has failed to show that the action might have been brought in Montana, the case may not be transferred there. Mr. Scrantom's motion to transfer is therefore denied without prejudice.

## CONCLUSION

For the reasons stated above, defendants' motions to dismiss are GRANTED with respect to the tortious interference with business relations claim and DENIED with respect to all other claims. Mr. Scrantom's motion to dismiss under principles of abstention is DENIED, and his motion to transfer venue is DENIED without prejudice.

In formulating a case management plan, the parties are encouraged to consider whether the following ought to be ordered: (1) tailored, focused discovery on the issue of Mr. Scrantom's status as Juridica's agent; and/or (2) coordination of pretrial discovery with the actions pending in Montana.

SO ORDERED.